NNN Durham Office Portfolio 1, LLC v. Grubb & Ellis Co.; NNN Durham Office Portfolio 1, LLC v. Highwoods Realty Ltd. P'ship, 2016 NCBC 93A.

STATE OF NORTH CAROLINA

COUNTY OF DURHAM

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
10 CVS 4392; 12 CVS 3945

NNN DURHAM OFFICE
PORTFOLIO 1, LLC; et al.,

        Plaintiffs,

    v.

GRUBB & ELLIS COMPANY;
GRUBB & ELLIS REALTY
INVESTORS, LLC; GRUBB & ELLIS
SECURITIES, INC.; NNN DURHAM
OFFICE PORTFOLIO, LLC; and NNN
REALTY ADVISORS, INC.,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**REVISED ORDER & OPINION
AND FINAL JUDGMENT**

NNN DURHAM OFFICE
PORTFOLIO 1, LLC; et al.,

        Plaintiffs,

    v.

HIGHWOODS REALTY LIMITED
PARTNERSHIP; HIGHWOODS DLF
98/29, LLC; HIGHWOODS DLF, LLC;
HIGHWOODS PROPERTIES, INC.;
GRUBB & ELLIS|THOMAS
LINDERMAN GRAHAM; and
THOMAS LINDERMAN GRAHAM
INC.,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

1.      THESE MATTERS are before the Court on multiple dispositive motions filed in the two above-captioned lawsuits: *NNN Durham Office Portfolio 1, LLC v.*

*Grubb & Ellis Co.*, No. 10 CVS 4392 (the "Grubb & Ellis Lawsuit") and *NNN Durham Office Portfolio 1, LLC v. Highwoods Realty Ltd. Partnership*, No. 12 CVS 3945 (the "Highwoods Lawsuit").

> *Stark Law Group, PLLC, by Thomas H. Stark and Sara Pohlman Stark, and Penry Riemann, PLLC, by J. Anthony Penry, for Plaintiffs.*
>
> *Parker Poe Adams & Bernstein LLP, by Charles E. Raynal IV and Jamie S. Schwedler, for Defendants Grubb & Ellis Company and Grubb & Ellis Securities, Inc.*
>
> *Harris Sarratt & Hodges, LLP, by John L. Sarratt, for Defendants Grubb & Ellis Realty Investors, LLC, NNN Durham Office Portfolio, LLC, and NNN Realty Advisors, Inc.*
>
> *Ellis & Winters LLP, by Jonathan D. Sasser, James M. Weiss, Jeremy M. Falcone, and Emily Erixson, for Defendants Highwoods Realty Limited Partnership, Highwoods DLF 98/29, LLC, Highwoods DLF, LLC, and Highwoods Properties, Inc.*
>
> *Manning, Fulton & Skinner, P.A., by Michael T. Medford and J. Whitfield Gibson, for Defendants Thomas Linderman Graham Inc. and Grubb & Ellis/Thomas Linderman Graham.*

Gale, Chief Judge.

## I.   INTRODUCTION

2.     This litigation concerns a commercial-real-estate portfolio of five office buildings in Durham, North Carolina (the "Durham Property").  Plaintiffs are a combination of limited-liability companies ("LLCs") and members of those LLCs who utilized a tax-deferred exchange under section 1031 of the Internal Revenue Code to purchase fractional tenant-in-common ("TIC") interests in the Durham Property. Plaintiffs claim that they were induced to purchase interests in the Durham Property by materially false statements or omissions in a private-placement memorandum

("PPM") concerning the probability that the Durham Property's primary credit tenant would renew its leases. The primary credit tenant's leases were critical to the Durham Property's value, as demonstrated when that tenant later terminated its leases and the Property went into foreclosure.

3.      In the Grubb & Ellis Lawsuit, Plaintiffs bring claims against the entity that issued the PPM and against other related entities allegedly responsible for the misrepresentations in the PPM. Plaintiffs claim that those Defendants are subject to primary liability under the North Carolina Securities Act ("Securities Act").

4.      In the Highwoods Lawsuit, Plaintiffs bring claims against the Durham Property's prior owner and the prior owner's selling agent. Plaintiffs contend that those Defendants had material knowledge that they failed to disclose, which led to the misrepresentations in the PPM and subjects those Defendants to secondary liability under the Securities Act.

5.      All parties in the two lawsuits have moved for summary judgment on one or more ground. This Order & Opinion addresses the following motions.

6.      The first motion is The Highwoods Defendants' Motion for Partial Summary Judgment that the Transaction at Issue Does Not Constitute a Security Under the North Carolina Securities Act ("Highwoods' Motion for Partial Summary Judgment"). This motion presents the question whether the TIC interests that Plaintiffs purchased in the Durham Property are "securities" within the meaning of the Securities Act. Highwoods' Motion for Partial Summary Judgment is DENIED, and summary judgment is GRANTED for Plaintiffs on this issue.

7.	The second and third motions are The Highwoods Defendants' Motion for Judgment on the Pleadings ("Highwoods' 12(c) Motion") and Thomas Linderman Graham, Inc.'s Motion for Judgment on the Pleadings ("TLG's 12(c) Motion") (collectively the "12(c) Motions"). The 12(c) Motions present the issue whether any claims under the Securities Act must be restricted to those Plaintiffs who either received or accepted an offer for the sale of a security in North Carolina. The 12(c) Motions are GRANTED, and any claim under the Securities Act brought by Plaintiffs other than NNN Durham Office Portfolio 13, LLC, Fannie B. Blackwelder, NNN Durham Office Portfolio 32, LLC, Kenneth Deno McLamb, NNN Durham Office Portfolio 33, LLC, and Cynthia McLamb are DISMISSED.

8.	The next five motions are cross-motions for summary judgment on the issues of primary and secondary liability under the Securities Act in both lawsuits, and on additional claims in the Grubb & Ellis Lawsuit. These motions include (1) Highwoods Defendants' Motion for Summary Judgment ("Highwoods' Motion for Summary Judgment"), (2) TLG's Motion for Summary Judgment, (3) Defendants' Joint Motion for Summary Judgment as to All Claims and All Parties ("Grubb & Ellis Defendants' Motion for Summary Judgment"), (4) Plaintiffs' Motion for Partial Summary Judgment Pursuant to N.C. R. Civ. P. 56 ("Plaintiffs' Motion for Partial Summary Judgment Against Highwoods & TLG"), and (5) Plaintiffs' Motion for Partial Summary Judgment Pursuant to N.C. R. Civ. P. 56 ("Plaintiffs' Motion for Partial Summary Judgment Against the Grubb & Ellis Defendants"). As to these motions:

- Highwoods' Motion for Summary Judgment is GRANTED;

- TLG's Motion for Summary Judgment is GRANTED;

- The Grubb & Ellis Defendants' Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART, and claims against Grubb & Ellis Company ("Grubb & Ellis Co.") and NNN Realty Advisors, Inc. ("NNN Realty Advisors") are DISMISSED;

- Plaintiffs' Motion for Partial Summary Judgment Against Highwoods & TLG is DENIED; and

- Plaintiffs' Motion for Partial Summary Judgment Against the Grubb & Ellis Defendants is DENIED.

9. Finally, the Court addresses Plaintiffs' Motion to Modify the Court's Order with Respect to Their Claims of Punitive Damages Pursuant to N.C. R. Civ. P. 54(b) ("Plaintiffs' 54(b) Motion"), filed in the Highwoods Lawsuit. This motion is DENIED AS MOOT.

10. In summary, the Court determines the following:

- Defendants have not presented adequate evidence for the Court to find that Plaintiffs' TIC interests, clearly marketed as securities, reserved a sufficient degree of control to the investors to disqualify the investment as an investment contract subject to the Securities Act.

- Claims under the Securities Act must be restricted to claims brought by Plaintiffs who received or accepted an offer to sell in

North Carolina, and all other Plaintiffs' Securities Act claims must be dismissed.

- All claims against Grubb & Ellis Co. and NNN Realty Advisors should be dismissed. There are material issues of fact as to whether other Defendants in the Grubb & Ellis Lawsuit may be found primarily liable under the Securities Act.

- Even assuming that Plaintiffs can prove that any of the Defendants in the Grubb & Ellis Lawsuit are primarily liable under the Securities Act, Plaintiffs have failed to demonstrate a basis for imposing secondary liability on Defendants in the Highwoods Lawsuit.

- Defendants in the Grubb & Ellis Lawsuit are not liable as a matter of law on Plaintiffs' claims of breach of contract, negligence, negligent misrepresentation, breach of fiduciary duty, constructive fraud, unfair and deceptive trade practices, civil conspiracy, or punitive damages under chapter 1D.

- This Order & Opinion resolves all claims against all parties in the Highwoods Lawsuit. The issues arising from the surviving claims in the Grubb & Ellis Lawsuit overlap with, and are common to, the issues arising from claims dismissed by this Order & Opinion in both the Grubb & Ellis Lawsuit and the Highwoods Lawsuit. Thus, the Court concludes, pursuant to Rule 54(b) of the North

Carolina Rules of Civil Procedure, that this Order & Opinion shall constitute a final judgment as to all parties and all claims except for the remaining claims brought by the North Carolina Plaintiffs in the Grubb & Ellis Lawsuit, and there is no just reason for delay in entering a final judgment. To the contrary, a delay in entering final judgment as to the dismissed parties and claims in the Grubb & Ellis Lawsuit would cause substantial injustice to all parties.

## II. THE PARTIES

### A. Plaintiffs

11. Plaintiffs in this litigation are thirty LLCs formed under Delaware law, and a combination of thirty-one individuals, trusts, and corporations that are the sole owners of those LLCs.[1] Both the investment device—tenancy in common—and the

---

[1] Plaintiffs in this litigation are NNN Durham Office Portfolio 1, LLC; James Osmond; NNN Durham Office Portfolio 2, LLC; James Sun Yu Lam; NNN Durham Office Portfolio 3, LLC; Gary F. Turtle; NNN Durham Office Portfolio 4, LLC; Sherry L. Turtle; NNN Durham Office Portfolio 5, LLC; Gregory R. Maloney; NNN Durham Office Portfolio 6, LLC; Sharon I. Maloney; NNN Durham Office Portfolio 7, LLC; Jack Miller and Patricia M. Miller, Trustees for the Ray and Patricia M. Miller Trust; NNN Durham Office Portfolio 9, LLC; PCL Property, LLC; NNN Durham Office Portfolio 10, LLC; Frances H. Kieffer, Trustee for the Frances H. Kieffer 2000 Trust; NNN Durham Office Portfolio 11, LLC; Frank A. Norman, Jr.; NNN Durham Office Portfolio 12, LLC; St. Kitts Investments, LLC; NNN Durham Office Portfolio 13, LLC; Fannie B. Blackwelder; NNN Durham Office Portfolio 14, LLC; Samuel Davidson, Trustee for the Revocable Living Trust of Barbara L. Davidson; NNN Durham Office Portfolio 15, LLC; Frederick J. Hornbacher, Trustee for the Frederick J. Hornbacher Living Trust; NNN Durham Office Portfolio 16, LLC; Roberta MacGregor Masson, Trustee for the Roberta MacGregor Masson 2005 Trust; NNN Durham Office Portfolio 17, LLC; William B. Wachter II, Trustee for the William B. Wachter II Trust; NNN Durham Office Portfolio 18, LLC; Susan B. Wachter, Trustee for the Susan B. Wachter Trust; NNN Durham Office Portfolio 19, LLC; Pell/Cruz Investments, Inc.; NNN Durham Office Portfolio 20, LLC; Jack R. Brown; NNN Durham Office Portfolio 21, LLC; Patricia A. Brown; NNN Durham

holders of TIC interests—tenants in common—are referred to as "TICs" in this Order & Opinion.

12. As a prerequisite to investing in the Durham Property, each TIC owner qualified as an accredited investor by meeting certain income and net-worth requirements. Only three TIC owners—Fannie B. Blackwelder, Kenneth Deno McLamb, and Cynthia McLamb—are North Carolina residents. Those TIC owners and their respective LLCs—NNN Durham Office Portfolio 13, LLC, NNN Durham Office Portfolio 32, LLC, and NNN Durham Office Portfolio 33, LLC—are collectively referred to as the "North Carolina Plaintiffs." The other Plaintiffs (the "Out-of-State Plaintiffs") received and accepted offers to purchase their TIC interests outside of North Carolina.

## B. The Highwoods Defendants

13. Defendants in the Highwoods Lawsuit are four entities that comprise a publicly traded real-estate investment trust: (1) Highwoods DLF 98/29, LLC, (2) Highwoods DLF, LLC, (3) Highwoods Properties, Inc., and (4) Highwoods Realty Limited Partnership (collectively "Highwoods"). Highwoods owns, develops, acquires, leases, and manages properties in the Southeast.

---

Office Portfolio 22, LLC; Jack D. La Flesch, Trustee for the JDL Trust; NNN Durham Office Portfolio 24, LLC; James K. Merrill and Muriel Sample, Successor Trustees for the John Irvin Montgomery Trust; NNN Durham Office Portfolio 26, LLC; C.G.B.M.T. Enterprises, Inc.; NNN Durham Office Portfolio 27, LLC; Susan E. Wagner; NNN Durham Office Portfolio 28, LLC; Federic J. Van Dis; NNN Durham Office Portfolio 29, LLC; Lawrence A. Wattson and Stephanie T. Wattson, Trustees for the Lawrence A. and Stephanie T. Wattson 2006 Trust; NNN Durham Office Portfolio 30, LLC; DAS Unlimited, Inc.; NNN Durham Office Portfolio 32, LLC; Kenneth Deno McLamb; NNN Durham Office Portfolio 33, LLC; Cynthia L. McLamb; NNN Durham Office Portfolio 34, LLC; Mark B. Pista; and Carol E. Pista.

14.     Highwoods owned the Durham Property from March 15, 1999, to March 8, 2007.

## C. Thomas Linderman Graham Inc.

15.     Thomas Linderman Graham Inc. ("TLG") is a former North Carolina-based commercial-real-estate company.  TLG conducted business under the trade name Grubb & Ellis|Thomas Linderman Graham as a member of a network of independently owned and operated real-estate brokerage businesses that grant permission to use the Grubb & Ellis brand name.

16.     TLG was Highwoods' exclusive selling agent for the sale of the Durham Property.

## D. The Grubb & Ellis Defendants

17.     Defendants in the Grubb & Ellis Lawsuit are Grubb & Ellis Co., Grubb & Ellis Realty Investors, LLC ("GERI"), Grubb & Ellis Securities, Inc. ("Grubb & Ellis Securities"), NNN Durham Office Portfolio, LLC ("NNN Office"), and NNN Realty Advisors (collectively the "Grubb & Ellis Defendants").  For simplicity, in this Order & Opinion, the Court refers to GERI as "Triple Net," and to Grubb & Ellis Securities as "NNN Capital."

### (1) Grubb & Ellis Co.

18.     Grubb & Ellis Co. is a Delaware corporation that was founded in 1958, and by the mid-1980s, had become the third largest commercial-real-estate firm in the United States.

19.     Grubb & Ellis Co. was not directly involved with the sale or purchase of the Durham Property. On December 10, 2007, Grubb & Ellis Co. completed a reverse triangular merger with NNN Realty Advisors, which caused NNN Realty Advisors and its affiliates to become wholly owned subsidiaries of Grubb & Ellis Co. Through the merger, Grubb & Ellis Co. acquired NNN Realty Advisors' 1031 TIC-managed portfolio, which included the portfolio for the Durham Property.

20.     Plaintiffs now concede that all claims against Grubb & Ellis Co. should be dismissed.

### (2) Triple Net

21.     Founded in 1998, Triple Net Properties, LLC ("Triple Net") acquired, syndicated, and managed commercial properties for TIC ownership, and sponsored more than 150 TIC programs. Triple Net was the manager of both NNN Office and Triple Net Properties Realty, Inc. ("Triple Net Realty"), the property manager for the Durham Property, which is not named as a defendant in this litigation.

22.     Triple Net's name changed to GERI in 2007 when NNN Realty Advisors merged with Grubb & Ellis Co. The company's name changed to NNN Realty Investors, LLC in August 2011.

### (3) NNN Capital

23.     NNN Capital Corp. ("NNN Capital") was the managing broker–dealer that offered TIC interests in the Durham Property to Plaintiffs. After the Grubb & Ellis–NNN Realty Advisors merger in December 2007, NNN Capital's name changed to Grubb & Ellis Securities.

### (4) NNN Office

24.     NNN Office is a Delaware LLC formed by Triple Net in 2007 for the sole purpose of acquiring the Durham Property.

25.     After forming NNN Office, Triple Net prepared the PPM that was utilized in offering TIC interests in the Durham Property, and issued the PPM through NNN Office.  NNN Office owned a 15.773% TIC interest in the Durham Property and is referred to as "TIC 0" in its capacity as a TIC owner.

### (5) NNN Realty Advisors

26.     NNN Realty Advisors was formed in September 2006 as the parent company of Triple Net, Triple Net Realty, and NNN Capital.  NNN Realty Advisors became a subsidiary of Grubb & Ellis Co. when those companies merged in 2007.

### III.     FACTUAL BACKGROUND

27.     The Court does not make findings of fact when it rules on a motion for summary judgment, but it may summarize the underlying facts to provide context for its ruling. *See, e.g.*, *In re Estate of Pope*, 192 N.C. App. 321, 329, 666 S.E.2d 140, 147 (2008).  Contested facts are construed in favor of the party opposing the motion. *Dalton v. Camp*, 353 N.C. 647, 651, 548 S.E.2d 704, 707 (2001).

### A. The Durham Property

28.     The Durham Property includes five office buildings in Durham, North Carolina, located at 3414 Duke Street, 4117 North Roxboro Road, 3404 North Duke Street, 4101 North Roxboro Road, and 4020 North Roxboro Road.

29.	In 2006, when Highwoods first determined that it would sell the Durham Property, approximately 99% of the office space in the Property was under lease. Two primary tenants were Duke Pediatrics and Duke's Patient Revenue Management Organization ("PRMO"), both which are affiliated with Duke University Health System, Inc. (collectively "Duke"). Duke leased 52% of the Durham Property. PRMO occupied three of the five buildings in the Property, including a sublease with Qualex, Inc. in half of one building. PRMO's sublease was due to expire in February 2009, and its leases in the other two buildings were set to expire in June 2010.

B.	The Confidential Offering Memorandum

30.	In spring 2006, Highwoods approached TLG about selling the Durham Property. Highwoods and TLG entered into an exclusive listing agreement in October 2006 for TLG to market and sell the Durham Property. TLG prepared a Confidential Offering Memorandum ("COM") for prospective buyers, dated December 6, 2006. (*See* Highwoods' Dep. Ex. 66 ("COM").) The COM targeted primarily large real-estate holding companies and real-estate investment trusts. There has been no assertion that Highwoods or TLG marketed the Durham Property as a security.

31.	Based on information provided by Highwoods, TLG prepared an ARGUS software model to accompany the COM. (Merklein Dep. vol. II, 364:7–13.) An ARGUS model creates a future cash flow based on certain assumptions, such as renewal probabilities for current tenants, market rental rates, and tenant-improvement costs. (Merklein Dep. vol. II, 363:6–365:12.) The COM disclosed that the leases for the Durham Property's tenants were set to expire in 2009 and 2010 and

contained no renewal options.  (COM 34–38.)  The assumptions in TLG's ARGUS model showed a tenant-renewal probability of 75% for four buildings in the Durham Property, and a 90% renewal probability for one building.  (Merklein Dep. vol. II, 366:12–14.)  Prospective purchasers were able to prepare their own projections based on modified assumptions.  (Merklein Dep. vol. II, 366:20–367:6, 370:2–16.)

32.    The record demonstrates that no Plaintiff directly relied on the information in the COM to make their investment.  In its Order & Opinion on motions to dismiss in the Highwoods Lawsuit in 2013 ("February 2013 Decision"), the Court rejected any claim based on indirect reliance stemming from Triple Net's reliance on the COM.  *See NNN Durham Office Portfolio 1, LLC v. Highwoods Realty Ltd. P'ship*, No. 12 CVS 3945, 2013 NCBC LEXIS 11, at *62–63 (N.C. Super. Ct. Feb. 19, 2013).

C.  Prior Developments Not Disclosed in the COM

33.    Before the COM was issued, Duke had taken preliminary steps to prepare for potentially relocating its PRMO operations, including issuing a public request for proposal ("RFP") for a build-to-suit building.  (Selig Dep. vol. II, 212:14–213:13, June 4, 2015.)  In September 2006, in response to the RFP, Highwoods made an initial informal proposal for a build-to-suit building for Duke to be ready by July 2008.  (*See* Selig Dep. Ex. 4, at 2.)  Highwoods made a formal build-to-suit proposal for Duke on December 6, 2006.  (*See* Selig Dep. Ex. 1289.)  By January 2007, Highwoods had offered to pay Duke's remaining lease obligations if PRMO chose to vacate the Durham Property before its leases expired.  (Massey Dep. Ex. 545.)  The COM did not disclose this information.

34.     TLG was aware that Duke saw significant limitations with PRMO's space in the Durham Property.   In a November 21, 2006 e-mail from TLG representative Jim McMillan to Highwoods' management, McMillan said that Scott Selig, Duke's associate vice president of capital assets, had advised him that Duke was looking at potential relocation options, in part because PRMO's space in the Durham Property had significant inefficiencies, including excessive square footage per person.  (McMillan Dep. Ex. 773.)

35.     Several days earlier, McMillan had shared with Highwoods a valuation that varied from the ARGUS-based valuation reflected in the COM.   Whereas the COM included a projection based on a 75% probability of Duke renewing its leases in four of the five office buildings, TLG separately shared with Highwoods valuations based on a 25% and a 0% probability of renewal, using different discount rates to compare those valuations with the 75% valuation.  (*See* McMillan Dep. Ex. 771.)  In a cover e-mail, McMillan stated,

> [b]ottom line is if a buyer does not buy into this Duke renewal then you are looking at a higher present value calc and ultimately a valuation around $25.6 to $26.6 million.  Most will end up in the middle around $28–$29 million with our top and ultimate buyer buying into it and ending up to our pricing we discussed today.

(McMillan Dep. Ex. 760.)

36.     In April 2006, McMillan, aware that Duke's leases would expire in 2009 and 2010, had settled on a "fairly conservative" valuation of $30.2 to $31.3 million. (McMillan Dep. Ex. 732.)  McMillan recognized that, "[a]ll in all, a big part of th[e]

sale will be the environment the properties sit in and the likelihood an[ ] investor believes Duke is there for the long run." (McMillan Dep. Ex. 732.)

D. Triple Net Submits the High Bid on the Durham Property

37.     TLG received eleven initial bids on the Durham Property.  Triple Net submitted the winning bid of $34.2 million on December 21, 2006, conditioned on a fifteen-day due-diligence period that would commence upon Highwoods providing due-diligence materials to Triple Net.  (McMillan Dep. Exs. 799, 801.)  The offer disclosed that Triple Net was contemplating a syndication through which it would offer fractional interests.  Triple Net was well known for offering TIC syndications.

38.     Highwoods delivered the due-diligence materials to Triple Net on January 9, 2007.  (McMillan Dep. Ex. 814.)  Highwoods and Triple Net executed a Purchase and Sale Agreement with an effective date of January 24, 2007.  (*See* Grubb & Ellis Defs.' Summ. J. Ex. 2 ("Purchase & Sale Agreement").)  The Purchase and Sale Agreement acknowledged Triple Net's option to structure the sale as a 1031 exchange, and recognized that Triple Net could assign the purchase contract to a publicly registered company required to make filings with the SEC.  (Purchase & Sale Agreement ¶¶ 14, 29.)

39.     The offer acknowledged Triple Net's "intention of making and relying upon its own investigation of the physical, environmental, economic use, compliance, and legal condition of the Property," with an agreement that Triple Net would "not later rely . . . upon any representations and warranties made by [Highwoods or Highwoods' agents]." (Purchase & Sale Agreement ¶ 11.6.)  Triple Net's obligation to

close was conditioned on, among other things, no major tenant having defaulted under their lease or giving written notice to Highwoods of their intent to default. (Purchase & Sale Agreement ¶ 28.)

### E. The PPM

40. Triple Net intended to sell TIC interests as securities pursuant to a Regulation D private placement when it made its offer to purchase the Durham Property. Triple Net began undertaking efforts necessary to solicit TIC investors to purchase the Property in early January 2007, after it had submitted its purchase offer to Highwoods, but before it had completed its due diligence and executed the final purchase agreement.

41. On January 5, 2007, Triple Net prepared the PPM and other offering materials for prospective investors. (*See* Grubb & Ellis Defs.' Summ. J. Ex. 19 ("PPM").) The PPM disclosed the objectives, risks, and terms associated with investing in the Durham Property. The PPM also included the proposed LLC Agreement, Subscription Agreement, TIC Agreement, and Management Agreement. (*See* PPM Exs. A ("LLC Agreement"), B ("Subscription Agreement"), C ("TIC Agreement"), D ("Management Agreement").) Also on January 5, 2007, NNN Capital issued the Soliciting Dealer Agreement to broker–dealers. (*See* Grubb & Ellis Defs.' Summ. J. Ex. 40.)

42. The Court summarizes key provisions of the PPM below.

## (1) Limited to accredited investors who were to rely solely on the PPM

43.     To participate in the investment, each investor was required to complete a TIC purchaser questionnaire, which cautioned them to carefully read the PPM. (*See* Grubb & Ellis Defs.' Summ. J. Ex. 18, at 1.)

44.     The PPM named Triple Net as the manager of NNN Office, Triple Net Realty as the property manager for the Durham Property, and NNN Capital as the managing broker–dealer. (PPM i.) The PPM states that it was to serve as the exclusive basis for any purchase decision, and that a purchaser should not rely on any outside information or representations. (PPM iv.)

## (2) Risk factors

45.     The PPM contains eighteen pages of risk factors, including warnings that there was a large dependence on one tenant and that Duke's leases were set to expire. (PPM 9.)

46.     Under the risk factor "Large Dependence on One Tenant," the PPM explains the following:

> Duke University and its affiliates directly lease approximately 149,078 square feet in three buildings . . . . This accounts for approximately 54% of the available space in the Property. Of the leased space, 42,080 square feet expires in 2009 with the remaining 106,998 square feet expiring in 2010. In addition, the PRMO group has subleased . . . approximately 12% of the entire Property[ ] in the 3404 North Duke Street building from Qualex, Inc. and occupies most of this space. Qualex has subleased this space to Duke at a favorable rental rate as an incentive to sublease the entire second floor. The leasing broker who placed Duke within this space indicated that the PRMO group intends to grow into this space over time and may stay following the expiration of the Qualex lease. However, no assurance can be given that the PRMO group will lease this space following the Qualex expiration in 2010. Additionally, there are no renewal options on the

Duke leases covering the [4117 North Roxboro Road], 4020 North Roxboro Road and 4101 North Roxboro Road buildings. Based on conversations with local leasing brokers, Duke is price-sensitive to their space and may attempt to negotiate for below market rental rates in connection with a potential renewal of the space they currently occupy. Consequently, no assurance can be given that then-market rental rates could be attained should Duke choose to renew their respective leases in 2009 and 2010. Any large-scale departure by Duke would significantly affect the cash flow and fair market value of the Property and the economic viability of the Property would be jeopardized due to the loss of rental revenue and the substantial cost for capital improvements and leasing commissions that may be required to retenant the Property. In a worst case scenario, the rental income from the Property would not be sufficient to make debt service payments on the Loan. . . . [and] the Lender would have the ability to exercise its rights under the Loan documents, including foreclosure. If the Lender were to foreclose, the investors could suffer a complete loss of their investment and certain material adverse tax consequences.

(PPM 9.)

47. Under the risk factor "Expiration of Leases," the PPM further states the following:

Unless extended, leases with all of the tenants, representing 100% of the Property, will expire within the next 3 calendar years. . . . The Property Manager will use its good faith commercially reasonable efforts to retain existing tenants and/or to re-lease and re-tenant vacant premises in the Property. However, no assurance can be given that the Property Manager will be able to do so. . . . [I]f the tenants do not renew their leases or downsize the space leased, the Property would suffer vacancy when the leases expire and no assurance can be given that the Property Manager would be successful in re-leasing the vacant space. If the Property Manager were unable to re-lease this space, the Property would not perform as contemplated . . . .

(PPM 9.)

48. These risks were further reiterated in an addendum to the PPM. (*See* Grubb & Ellis Defs.' Summ. J. Ex. 21, at 4–10.)

### (3) The Business Plan

49. The PPM contains a Business Plan. (*See* PPM 39.) The PPM acknowledges that certain background information in the PPM was provided by TLG, but states that the Business Plan "is based solely on [Triple Net's] investigation of the Property, its location in the Durham, North Carolina office market and the tenants," and is subject to the risk factors listed in the PPM. (PPM 39.)

50. The Business Plan incorporates a financial analysis entitled "Projection of Income, Cash Flow and Loan Amortization of the Property," attached as an exhibit to the PPM. (PPM Ex. F.)

51. Regarding Duke's leases, the Business Plan states that, "[b]ased on Duke's longevity as a tenant at the Property, [Triple Net] believes that Duke will continue to renew each of their leases." (PPM 40.) It further states that,

> [b]ased upon the importance of Duke's tenancy to the Property, [Triple Net] intends to engage Duke regarding extending their respective leases. This will help reduce the uncertainty surrounding the expiration of their leases over the first three years of the projected five year holding period. However, there can be no assurance that Duke . . . will in fact extend their leases at the Property.

(PPM 40.)

### (4) Forward-looking statements

52. The PPM warns that the assumptions and future projections in the PPM and the Addendum "may contain forward-looking statements":

> You can identify such statements by the use of forward-looking words such as "may," "will," "anticipate," "expect," "estimate," "continue," or other such words. These types of statements discuss future expectations or contain projections or estimates. When considering such forward-looking statements, you should keep in mind the risk factors set forth in

[the PPM]. These risk factors and other unidentified factors could cause actual results to differ materially from those contained in any forward-looking statement.

(PPM 92.)

**(5) The Management Agreement and management control reserved to the TICs**

53. The Management Agreement for the Durham Property gave the TICs the ability to hire and fire the property manager, the leasing agent, and the asset manager. (Management Agreement §§ 10.1, .2.) It also allowed the TICs to control the Durham Property's expenditures by approving budgets. (Management Agreement §§ 2.5.1, 2.9, .10.)

54. The TICs were granted the right to terminate the Management Agreement in a manner that gave all or any one of the TICs on an annual basis the individual right to terminate the Management Agreement without cause. However, the termination right was also conditioned on a separate provision, which states that the exercise of that right would trigger other obligations, such as requiring a TIC who exercises the termination right to pay a pro rata share of a significant setup fee. Additionally, the exercise of that right would create a default in the loan agreement. The property manager was granted a right to preclude termination by purchasing a TIC's interest. (Management Agreement § 10.1.) A separate provision in the TIC Agreement restricts a TIC's right to act on behalf of the other TICs or bind the other TICs. (TIC Agreement ¶ 1.5.)

55. The Management Agreement required the TICs' unanimous consent to approve all proposed leases. (Management Agreement § 2.6.2.) The Management

Agreement provides that the TICs approved all existing leases when they closed on their purchase. (Management Agreement § 2.6.1.) However, any new lease terms generally had to be approved by unanimous consent of the TICs, but would be considered approved absent an express notice of rejection. (Management Agreement § 2.6.2.) If a TIC rejected a proposed new lease, the new lease would not be authorized, and the property manager would have no authority to execute the proposed lease. (Management Agreement § 2.6.2.)

### F. Triple Net's Post-Offer Due Diligence

56. Triple Net continued its due-diligence efforts in the fifteen-day period between January 9, 2007, when Highwoods provided the due-diligence materials, and January 24, 2007, when it executed the final purchase agreement. Triple Net's due-diligence efforts included at least securing a due-diligence report and an appraisal, and interviewing the Durham Property's tenants.

57. Triple Net consultant Joseph D. Steffe prepared a Due Diligence Report, dated January 16, 2007. (Prosky Dep. Ex. 1144 ("Due Diligence Report").) Like the initial PPM, the Due Diligence Report acknowledges that all leases in the Durham Property would expire within three years, and that there was a large dependency on Duke as a tenant. (Due Diligence Report at GE000167.) The report states that Duke's leases "carr[ied] the usual 75% renewal probability." (Due Diligence Report at GE000167.)

58. A few days after the Due Diligence Report was executed, Triple Net executive Mike Waddell interviewed all tenants in the Durham Property, including

Selig, who was in charge of negotiating Duke's off-campus real-estate leases. McMillan attended Waddell's January 19, 2007 meeting with Selig. Both Waddell and Selig prepared contemporaneous memoranda from the interview. Selig, Waddell, and McMillan each provided testimony about the meeting.

59. Selig recalled advising Waddell that Duke had issued an RFP for new space and had received several proposals in response, but Waddell did not recall being advised of this information. (*Compare* Selig Dep. 56:19–57:2, 59:1–4, July 3, 2012, *with* Waddell Dep. vol. II, 414:11–415:8, 418:13–19.) Duke retained Corporate Realty Associates ("CRA") to solicit proposals for a new building as an alternative to renewing its leases in the Durham Property. There is no evidence that Waddell specifically learned that Highwoods had submitted a build-to-suit proposal to Duke. It does not appear that Waddell interviewed CRA.

60. Selig further testified that Duke had not made a decision on whether to relocate as of 2007. (Selig Dep. vol. II, 96:10–11, June 4, 2015.) An internal January 16, 2007 Highwoods e-mail quoted Selig as stating that PRMO was uncertain about its plans. (Massey Dep. Ex. 548.) Selig testified that he told Waddell that Duke had not ultimately decided whether to renew PRMO's leases. (Selig Dep. vol. II, 95:20–96:5, June 4, 2015; *see also* Waddell Dep. vol. I, 116:14–16; Merklein Dep. Ex. 193.)

61. Waddell prepared a memo that summarized his interview with Selig. (Waddell Dep. Ex. 1083.) He acknowledged that Selig had expressed concerns about the efficiency of PRMO's space and had retained a firm to conduct a space-utilization study. (Waddell Dep. Ex. 1083; *see also* Selig Dep. vol. II, 98:3–18, June 4, 2015;

Waddell Dep. vol. I, 116:1–25.) Waddell testified that he ultimately concluded that Duke was not ready to address its renewal options in January 2007. (Waddell Dep. vol. I, 116:14–118:4.)

62. On January 24, 2007, Triple Net obtained an independent appraisal from Robert A. Stanger & Co., Inc. (*See* Grubb & Ellis Defs.' Summ. J. Ex. 6 ("Stanger Appraisal").) The appraisal valued the Durham Property at $34.25 million—slightly higher than Triple Net's purchase price of $34.2 million. (Stanger Appraisal 10.) The appraisal noted that Duke Pediatrics had already inquired about renewing its lease in the Property. (Stanger Appraisal E-1.) The appraisal assigned an overall lease-renewal probability of 80% for all tenants, a 90% renewal rate for Duke, and a 40% renewal rate for the Qualex sublease. (Stanger Appraisal iii.)

## G. The Final Purchase and Sale Agreement

63. The final Purchase and Sale Agreement between Highwoods and Triple Net went into effect on January 24, 2007.

64. Highwoods did not make any warranty as to whether existing leases in the Property would be renewed, but the sale was conditioned on Highwoods having not received notice that any tenant intended to default on their lease. (Purchase & Sale Agreement ¶¶ 12.1.7, 28.)

65. Triple Net was granted the right to designate up to thirty-five entities as grantees of the deed. (Purchase & Sale Agreement ¶ 22.) Pursuant to that provision, Highwoods issued deeds directly to the TICs at closing on March 12, 2007. Collectively, the Durham Property's investors paid Triple Net more than $40 million,

including roughly $15 million in cash, with a $26 million mortgage to finance the remaining balance. (*See* Highwoods' Mot. Compel Produc. Docs. Ex. 7.)

## H. Supplements to the PPM

66. After Highwoods and Triple Net executed the final Purchase and Sale Agreement, Triple Net issued three PPM supplements detailing information that Triple Net learned after it issued the original PPM.

67. The first supplement, dated January 26, 2007, gives an updated cash-flow projection with assumptions regarding lease-renewal probabilities that differ from the assumptions listed in the original PPM. The first supplement lists a probability of 50% for one building, and a probability of 75% for three buildings. (Waddell Dep. Ex. 1084, at NNN021003.)

68. The second supplement, dated February 20, 2007, describes a revision to the TIC Agreement but contains no further discussion of the leases or renewal probabilities. (Waddell Dep. Ex. 1085.)

69. The third supplement, dated April 9, 2007, reflects that Triple Net closed on the Durham Property on March 12, 2007. (Waddell Dep. Ex. 1086.)

70. Aside from the revised cash-flow projection in the first supplement, the risk factors and the Business Plan in the original PPM were unchanged by the PPM supplements.

71. Triple Net took further actions that evidenced its intent to sell the TIC interests as securities pursuant to a Regulation D private offering. On February 22, 2007, between the issuance of the first and second PPM supplements, NNN Office

filed a Form D for the sale of securities with the SEC. (Pls.' Resp. Mem. Opp'n to Highwoods' Mot. Partial Summ. J. Ex. 1.) That same day, Triple Net's counsel, Hirschler Fleischer, sent letter notifications of the anticipated sale of securities to regulators in the various states in which the securities were to be offered. (Pls.' Resp. Mem. Opp'n to Highwoods' Mot. Partial Summ. J. Ex. 1.)

## I. Duke's Ultimate Decision to Relocate PRMO's Operations

72.     As noted, Waddell had concluded that Duke was not ready to discuss lease renewal in January 2007. In August 2007, Duke advised that it was prepared to discuss lease renewal. Around that time, Duke's possible relocation was reported in local news stories. *See, e.g.*, Jack Hagel, *RTP Beckons Duke*, News & Observer, Aug. 6, 2007. As part of lease-renewal negotiations, Plaintiffs hired Little Diversified Architectural Consulting to consider a space redesign to address Duke's concerns regarding space inefficiencies for PRMO's operations in the Durham Property. (*See* Merklein Dep. Ex. 147.)

73.     When lease-renewal negotiations began, cost proposals for PRMO's potential relocation substantially exceeded the rents for PRMO's leases in the Durham Property. In late-October 2007, Hock Development Group ("Hock") reduced the cost of its relocation proposal to Duke by approximately $1 million.

74.     In November 2007, Duke announced its decision not to renew PRMO's leases beyond the expiration date in June 2010. On December 28, 2007, Duke entered into a new lease with T.W. Alexander Properties, LLC for a new office building in

South Durham that was built by Hock. PRMO vacated the Durham Property on December 12, 2008.

75. Duke Pediatrics renewed its lease in the Durham Property for another seven years, and is still a tenant in the Property today.

## J. Triple Net Suspends Dividend Distributions

76. Part of the TICs' investment in the Durham Property included monthly dividend distributions. Those distributions were suspended when economic conditions worsened in December 2008. (*See* Highwoods' Dep. Ex. 253.) According to Triple Net, it was necessary for the company to suspend distributions "in order to begin conserving cash to mitigate the loss of revenue and to fund future leasing costs associated with the loss of key tenancies in 2009 and 2010." (Highwoods' Dep. Ex. 253.)

## K. The TICs' Control over the Durham Property's Management

77. Conflict between the TICs and the Durham Property's management heightened in 2009, as adverse economic conditions continued. For instance, in August 2009, several of the TICs sent a list of demands to the Property's manager. Those demands included requests to lower the fee structure, fire the onsite manager, eliminate accounting fees, present proposed capital improvements in detail for the TICs' approval, and provide monthly reporting instead of quarterly reporting. (*See* Highwoods' Mot. Partial Summ. J. Exs. D, E.)

78. Throughout 2009, Triple Net—whose name had changed to GERI by that time—and TLG continued working to find new tenants for the Durham Property.

In fall 2009, Triple Net asked the TICs to approve a signed eight-year lease with Durham Dermatology Associates, LLP. Plaintiff James Merrill rejected the lease. That rejection may have been the trigger for TLG's resignation as leasing broker for the Durham Property. In its resignation letter on December 16, 2009, TLG noted that the TICs' "ability to reject negotiated terms with a prospective tenant place[d] [TLG] in a very precarious and reputation-damaging position." (Highwoods' Mot. Partial Summ. J. Ex. V.)

79.     In mid-2009, the TICs contacted National Asset Services, Inc. ("NAS"), an outside management company located in California, and began efforts to replace Triple Net as asset manager. The TICs worked together to create a list of TICs who approved Triple Net's removal. Their efforts included Mr. Merrill contacting the lender to ask that it become "immediately involved in the termination of Triple Net and the hiring of a new asset manager." (Highwoods' Dep. Ex. 899, at 5.) The TICs unanimously approved and delivered a notice of termination to Triple Net in December 2009. Triple Net ultimately agreed to transition management to NAS in January 2010.

## L. Plaintiffs Execute a Settlement Agreement

80.     In March 2010, Plaintiffs entered into a Confidential Mutual Settlement Agreement and Mutual Release ("Settlement Agreement") that allowed NAS to take over as asset manager for the Durham Property. (*See* Grubb & Ellis Defs.' Summ. J. Ex. 34 ("Settlement Agreement"), at 1.)

81.    Further details of the Settlement Agreement are summarized in the analysis section of this Order & Opinion regarding the Grubb & Ellis Defendants' Motion for Summary Judgment, in which the Grubb & Ellis Defendants contend that the Settlement Agreement released all claims in the Grubb & Ellis Lawsuit.

## M. Foreclosure Following Loan Default

82.    From May to July 2010, the TICs voted for several cash distributions that totaled more than $1.5 million. (*See* Highwoods' Mot. Compel Produc. Docs. Exs. 6, 29, 30.) The purpose of withdrawing the money was to get it "out of . . . the reach of the lender" so that the funds would not be applied to the outstanding mortgage balance. (Kennedy Dep. vol. I, 84:1–2; *see also* Kennedy Dep. vol. I, 117:9–25.) The TICs knew that by withdrawing money, there would be insufficient funds to make payments on the mortgage. (Kennedy Dep. vol. III, 741:6–9.) At least some of the TICs intended to use the distributions to fund the present litigation. (*See* Highwoods' Dep. Ex. 340.)

83.    In April 2011, the lender initiated foreclosure proceedings on the Durham Property. NAS's role as asset manager ended in July 2011, when a court-appointed receiver took over the day-to-day management of the property. (Kennedy Dep. vol. I, 76:17–19.) The Durham Property was sold by upset bid at a public foreclosure sale in October 2011 and conveyed to the high bidder on December 20, 2011. Approximately 72% of the TIC ownership sued to recoup their losses.

## IV.  PROCEDURAL BACKGROUND

### A. The Grubb & Ellis Lawsuit

84.     Plaintiffs commenced the Grubb & Ellis Lawsuit on July 1, 2010, by filing a summons pursuant to Rule 3 of the North Carolina Rules of Civil Procedure. Plaintiffs filed their Complaint on July 21, 2010.  On August 24, 2010, Plaintiffs filed a notice of designation, and the case was designated a mandatory complex business case by the Chief Justice that same day.  The case was first assigned to the Honorable Ben F. Tennille of this Court on August 25, 2010, and then to the undersigned in March 2011 following Judge Tennille's retirement.

85.     Plaintiffs filed their First Amended Complaint ("Amended Complaint") on March 28, 2011, alleging claims of (1) breach of contract, (2) negligence, (3) negligent misrepresentation, (4) breach of fiduciary duty, (5) constructive fraud, (6) Securities Act violations, (7) unfair and deceptive trade practices, (8) civil conspiracy, and (9) punitive damages.

86.     Defendants filed a motion to dismiss under Rule 12(b)(6) on May 27, 2011, which the Court denied on August 18, 2011.

87.     Grubb & Ellis Co. and Grubb & Ellis Securities each filed a voluntary petition for Chapter 11 bankruptcy on February 20, 2012.  *See* Voluntary Petition, *In re Grubb & Ellis Co.*, No. 12-10685-MG (Bankr. S.D.N.Y. Feb. 20, 2012), ECF No. 1. Litigation in this Court was automatically stayed as to those Defendants until October 4, 2012, when the bankruptcy court approved the parties' stipulation to lift the stay.  *See* Stipulation & Order Between the Debtors & NNN Durham Office

Portfolio 1, LLC & Certain Other Tenant-in-Common Entities to Lift the Automatic Stay, *In re Grubb & Ellis Co.*, No. 12-10685-MG (Bankr. S.D.N.Y. Oct. 4, 2012), ECF No. 1813.

88.     The parties filed cross-motions for summary judgment on August 17, 2015.  Plaintiffs move for partial summary judgment on their Securities Act claim, and the Grubb & Ellis Defendants move for summary judgment on all claims pending against them.

B. The Highwoods Lawsuit

89.     Plaintiffs first filed a complaint against Highwoods and TLG on April 1, 2010.  Plaintiffs voluntarily dismissed that action without prejudice on July 6, 2011, after the case had been designated a mandatory complex business case and assigned to the undersigned.

90.     Plaintiffs filed their Complaint in the Highwoods Lawsuit on July 6, 2012, alleging claims of (1) fraud, (2) fraud in the inducement, (3) Securities Act violations, (4) unfair and deceptive trade practices, (5) negligent misrepresentation, (6) civil conspiracy, and (7) punitive damages.  Plaintiffs filed a notice of designation on July 6, 2012.  The Chief Justice designated the case a mandatory complex business case on July 11, 2012, and the matter was assigned to the undersigned on July 12, 2012.

91.     On February 19, 2013, the Court granted Highwoods' and TLG's motions to dismiss Plaintiffs' claims of fraud, fraud in the inducement, unfair and deceptive trade practices, negligent misrepresentation, and punitive damages.  *Highwoods,*

2013 NCBC LEXIS 11, at *66. The Court denied the motions to dismiss as to Plaintiffs' claims of secondary liability under N.C. Gen. Stat. § 7A-56(c)(2) (2015) of the Securities Act and conspiracy to violate that Act. *Highwoods*, 2013 NCBC LEXIS 11, at *66.

92. On November 15, 2013, Highwoods moved for partial summary judgment on the question whether the TICs' investment in the Durham Property qualifies as a sale of securities under the Securities Act. The Court deferred ruling on that motion until after the conclusion of fact discovery. *See* Order, *Highwoods*, No. 12 CVS 3945 (N.C. Super. Ct. Apr. 27, 2015).

93. On May 29, 2015, Highwoods and TLG filed their 12(c) Motions for judgment on the pleadings as to the claims of the fifty-five Out-of-State Plaintiffs on the grounds that those Plaintiffs have not alleged that they received or accepted an offer to sell a security in North Carolina and thus cannot recover under the Securities Act. The Court heard oral argument on the 12(c) Motions on July 16, 2015.

94. The parties filed cross-motions for summary judgment on August 17, 2015. Highwoods and TLG filed motions for summary judgment on all remaining claims pending against them. Plaintiffs move for partial summary judgment on their claim of secondary liability under the Securities Act.

95. Also on August 17, 2015, Plaintiffs filed their 54(b) Motion, asking the Court to modify its February 2013 Decision to reinstate Plaintiffs' punitive-damages claim.

96.     The Court held a joint hearing on the summary-judgment motions in both lawsuits and on Plaintiffs' 54(b) Motion on November 23, 2015. All motions have now been fully briefed, argued, and are ripe for disposition.

## V.     ANALYSIS

### A. Summary of the Issues Presented by the Dispositive Motions

97.     Plaintiffs present claims of both primary and secondary liability under the Securities Act, the latter depending on Plaintiffs' success under the former. The motions present two threshold issues as to the application of the Securities Act to Plaintiffs' various claims: (1) whether the TIC interests at issue qualify as securities under the Securities Act, and if so, (2) whether claims under the Securities Act must be limited to claims brought by Plaintiffs who received or accepted an offer to sell in North Carolina. An additional threshold issue for the Grubb & Ellis Defendants is whether the Settlement Agreement between the TICs and the Grubb & Ellis Defendants released claims asserted against the Grubb & Ellis Defendants in this litigation. Assuming Plaintiffs survive these threshold issues, the Court must then consider the parties' cross-motions to summarily adjudicate the issue of liability.

98.     Finally, Plaintiffs move under Rule 54(b) for the Court to reconsider its earlier ruling in which it dismissed Plaintiffs' claim for punitive damages against Highwoods and TLG.

### B. Standard of Review

99.     Highwoods and TLG present motions for judgment on the pleadings under Rule 12(c). All parties move for summary judgment under Rule 56.

### (1) The standard of review for judgment on the pleadings

100.    A motion for judgment on the pleadings under Rule 12(c) "is . . . proper . . . when all the material allegations of fact are admitted in the pleadings and only questions of law remain." *Ragsdale v. Kennedy*, 286 N.C. 130, 137, 209 S.E.2d 494, 499 (1974).  The purpose of Rule 12(c) "is to dispose of baseless claims or defenses when the formal pleadings reveal their lack of merit." *Id.*  When the Court reviews a complaint under Rule 12(c), it "is required to view the facts and permissible inferences in the light most favorable to the nonmoving party." *Id.*  A Rule 12(c) motion should be granted "when a complaint does not allege 'facts sufficient to state a cause of action or pleads facts which deny the right to any relief.'" *Reese v. Brooklyn Vill., LLC*, 209 N.C. App. 636, 641, 707 S.E.2d 249, 253 (2011) (quoting *Robertson v. Boyd*, 88 N.C. App. 437, 440, 363 S.E.2d 672, 675 (1988)).

### (2) The standard of review for summary judgment

101.    Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C. Gen. Stat. § 1A-1, Rule 56(c) (2015).  "Summary judgment is improper if any material fact is subject to dispute." *Culler v. Hamlett*, 148 N.C. App. 389, 391, 559 S.E.2d 192, 194 (2002).  The movant bears the burden of proving the lack of a triable issue. *Dalton*, 353 N.C. at 651, 548 S.E.2d at 707.  Once the movant has met that burden, the burden shifts to the nonmoving party to produce a forecast of evidence that demonstrates facts showing that it can establish a prima

facie case at trial. *Austin Maint. & Constr., Inc. v. Crowder Constr. Co.*, 224 N.C. App. 401, 407, 742 S.E.2d 535, 540 (2012). The Court must view all the presented evidence in the light most favorable to the nonmoving party. *Dalton*, 353 N.C. at 651, 548 S.E.2d at 707.

102. The Court applies these standards to the pending motions, and construes facts and inferences in favor of the party opposing the particular motion under consideration.

## C. Evidence that the TICs Retained Sufficient Control over the Durham Property's Management Is Inadequate to Place the TIC Interests Outside the Scope of the Securities Act.

103. It is clear that Triple Net marketed the TIC interests as securities and expected that Plaintiffs would consider the purchases securities. In their Motion for Partial Summary Judgment, Highwoods contends that the TIC interests nevertheless are not "securities" as defined by the Securities Act because Plaintiffs retained and exercised control over their investment.

104. The Court initially addressed the question whether the TIC interests qualify as securities in its February 2013 Decision in the context of motions to dismiss under Rule 12(b)(6). *See Highwoods*, 2013 NCBC LEXIS 11, at *20–24. The Court discussed the unsettled question of whether a TIC exchange is a sale of real estate or a sale of an investment contract within the scope of the Securities Act. *Id.* at *21–24. On this question, the Court denied Highwoods' and TLG's Rule 12(b)(6) motions.

105. Considering this issue at the summary-judgment posture under Rule 56, the Court rejects Plaintiffs' contention that the Court's ruling on the motions to

dismiss became the law of the case and precludes it from now considering on the developed record whether the TIC interests qualify as an investment contract and thus as securities. *See Barbour v. Little*, 37 N.C. App. 686, 692, 247 S.E.2d 252, 255–56 (1978) (recognizing that motions under Rule 12 and Rule 56 are governed by different standards). Likewise, the Court rejects Plaintiffs' argument that Highwoods and TLG are estopped from now denying that the TIC interests are securities. (*See* Pls.' Resp. Mem. Opp'n to Highwoods' Mot. Partial Summ. J. 22–23.)

106. Rather, the Court concludes that the manner in which the facts developed after the completion of the TIC exchange may bear on the expectations that the TICs had when they invested in the Durham Property, and that those expectations are relevant to the final determination of whether the TIC interests are properly considered an investment contract or a real-estate contract. Based on the developed record, the Court concludes that there is insufficient evidence for it to determine that Plaintiffs' TIC interests do not qualify as securities under the Securities Act. Accordingly, summary judgment must be denied for Highwoods and granted in favor of Plaintiffs on this issue.

107. A prerequisite to liability under the Securities Act is that the transaction must fall within the scope of the Act. The Securities Act defines "security" to include any "investment contract." N.C. Gen. Stat. § 78A-2(11) (2015).

108. The Securities Act does not itself define the term "investment contract." The North Carolina Administrative Code defines "investment contract" as used in section 78A-2(11) to include the following:

(a)     Any investment in a common enterprise with the expectation of profit to be derived through the essential managerial efforts of someone other than the investor. . . . "[C]ommon enterprise" means an enterprise in which the fortunes of the investor are interwoven with and dependent upon the efforts and success of those seeking the investment of a third party; and

(b)     Any investment by which an offeree furnishes initial value to an offeror, and a portion of this initial value is subjected to the risks of the enterprise, and the furnishing of this initial value is induced by the offeror's promises or representations which give rise to a reasonable understanding that a valuable benefit of some kind over and above the initial value will accrue to the offeree as a result of the operation of the enterprise, and the offeree does not receive the right to exercise practical and actual control over the managerial decisions of the enterprise.

18 N.C. Admin. Code 06A.1104(8)(a)–(b) (2016).

109.     Highwoods relies heavily on Rule 06A.1104(8)(b) when asserting that the record makes clear that the TICs collectively exercised practical and actual control over management decisions for the Durham Property to a degree that defeats their interests from being classified as an investment contract.  (*See* Highwoods' Reply Br. Supp. Mot. Partial Summ. J. 1 ("The parties agree that summary judgment is appropriate on a single issue: Did Plaintiffs have the right to exercise practical and actual control over the managerial decisions of their investment?").)

110.     Plaintiffs counter that Highwoods improperly conflates subsections (a) and (b) of Rule 06A.1104(8).  While not conceding Highwoods' argument based on Rule 06A.1104(8)(b), Plaintiffs contend that Rule 06A.1104(8)(a)'s definition of "investment contract" is less restrictive and does not demand the same absence of control that may be argued under Rule 06A.1104(8)(b), as long as the investment was a common enterprise and Plaintiffs relied on Triple Net's essential managerial

efforts. Plaintiffs contend that their ultimate efforts to salvage value in their investment do not disqualify their interests as an investment contract, when such efforts became necessary only because Triple Net's essential managerial efforts had failed.

111. The analysis whether a TIC interest is an "investment contract" begins with a review of the United States Supreme Court's holding in *SEC v. W. J. Howey Co.*, 328 U.S. 293 (1946). In *Howey*, the Supreme Court held that, under federal securities law, an investment contract contains four elements: "(1) an investment of money, (2) in a common enterprise, (3) an expectation of profits, and (4) the expectation that profits will arise solely from the efforts of the promoter or a third party." *Highwoods*, 2013 NCBC LEXIS 11, at *25 (discussing *Howey*, 328 U.S. at 298–99). The Supreme Court further noted that "investment contract" had not been earlier defined either by federal securities law or by the various state blue-sky laws, even though the term had been broadly construed in a way that protected investors and disregarded form "for substance and . . . placed [emphasis] upon economic reality." *Howey*, 328 U.S. at 298. Each of the four elements of the *Howey* test has been addressed in subsequent litigation, and some uncertainty remains as to how the test should be applied, particularly as to the fourth element's use of the term "solely."

112. In *SEC v. SG Ltd.*, the United States Court of Appeals for the First Circuit noted a significant variance in how courts have determined the meaning of "common enterprise." 265 F.3d 42, 49 (1st Cir. 2001). Some courts require a showing of horizontal commonality, which "involves the pooling of assets from multiple

investors so that all share in the profits and risks of the enterprise," while other courts have emphasized vertical commonality, which focuses on the degree that an investor depends on the efforts or expertise of the promoter. *Id.* The First Circuit further distinguished "broad vertical commonality" from "narrow vertical commonality." *Id.* Broad vertical commonality requires that the investors' well-being be dependent on the promoter's expertise, while narrow vertical commonality requires that the investors' fortunes be "interwoven with and dependent upon the efforts and success of those seeking the investment or of third parties." *Id.* (quoting *SEC v. Glenn W. Turner Enters., Inc.*, 474 F.2d 476, 482 n.7 (9th Cir. 1973)). Some courts allow for only one standard of commonality, while others recognize multiple tests for determining commonality. *Id.*

113. Subsections (a) and (b) of North Carolina's Rule 06A.1104(8) reflect these various approaches and the differing emphasis on the degree to which the investor is dependent on the efforts of the promoter or third party.

114. Rule 06A.1104(8)(a) requires both a "common enterprise" and "the expectation of profit to be derived from the *essential* managerial efforts of someone other than the investor." 18 N.C. Admin. Code 06A.1104(8)(a) (emphasis added). "Essential" management does not necessarily connote "exclusive" management. Rule 06A.1104(8)(b) does not expressly require a "common enterprise," but it contemplates a scenario where at least a portion of the value provided by the investor is subjected to the risk of an enterprise in which the investor "does not receive the right to exercise practical and actual control over the managerial decisions of the enterprise." 18 N.C.

Admin. Code 06A.1104(8)(b).  Rule 06A.1104(8)(a)'s emphasis on the "essential" managerial efforts of a common enterprise reflects a relaxation of *Howey*'s fourth element, which directs that profits result "solely from the efforts of the promoter or a third party."  *Howey*, 328 U.S. at 299.

115.     The nature in which TIC interests are marketed prevents a bright-line rule on whether a TIC interest is a security or a syndicated real-estate interest. Historically, TIC transactions have been structured as sales of securities, in some instances, and as sales of syndicated real-estate interests in others.  *See* Triple Net Leasing, LLC, SEC No-Action Letter, 2000 SEC No-Act. LEXIS 824 (Aug. 23, 2000); Nat'l Ass'n of Sec. Dealers, Notice to Members No. 05-18, *Private Placements of Tenants-in-Common Interests* 3 & n.5 (2005) (explaining that "[w]hen TIC[ ] [interests] are offered and sold together with other arrangements, they generally would constitute investment contracts and thus securities," but that "TIC interests in real property standing alone generally are not securities"); (Hanson Dep. 57:23–25 (noting that TIC transactions are structured in "one of two ways . . . . as a real estate [transaction] or as a security" transaction).)

116.     The record here is clear that Triple Net marketed the sale of Plaintiffs' TIC interests as securities.  This is evidenced by the various transactional documents, the PPM, the broker agreements, and the communications with the SEC and various state-enforcement agencies.  Those documents expressly and specifically refer to the TIC interests as "securities."  (*See, e.g.*, PPM ii, iv, 1, 23, 50; Pls.' Resp. to Highwoods' Mot. Partial Summ. J. Exs. 1, 2, 6.)  Of course, that fact does not necessarily end the

inquiry, because a TIC interest is not a "security" or an "investment contract" based solely on the label given to it by the promoter.

117.    *Howey* focuses on the investor's expectations at the time of investing, and representations that an investment is a security or an investment contract play into those expectations.  Here, in the risk-factors section of the PPM, a subheading labeled "Reliance on Management" cautions purchasers that

> [a]ll decisions regarding management of the Company's affairs . . . and the management of the Property, will be made exclusively by the Manager, the Property Manager and their Affiliates, and not by any of the Members or the Purchasers.  Accordingly, no person should purchase LLC Units unless that person is willing to entrust all aspects of management of the Company to the Manager and management of the Property to the Property Manager.

(PPM 21.)

118.    Taken alone, this language would suggest that the TIC interests satisfy the definition of an "investment contract" within the meaning of either Rule 06A.1104(8)(a) or Rule 06A.1104(8)(b).  But other provisions of the various transactional documents and agreements also reserve certain powers to the investors and provide that, under certain circumstances, Triple Net did not have exclusive control.  For example, the TICs were granted the right to terminate the Management Agreement on an annual basis without cause, albeit with the understanding that exercising that right would trigger obligations, such as requiring the TICs to pay a pro rata share of a significant setup fee, creating a default in the loan agreement.  That termination right was also conditioned on the property manager's right to purchase any Plaintiff's TIC interest.  (Management Agreement § 10.1.)

119. The transactional documents also provided for a degree of the TIC owners' control over potential future leases. The Management Agreement addressed leasing efforts, and at closing, the TICs approved all existing leases. (Management Agreement §§ 2.6.1, .2.) However, any new lease terms "generally [had to] be approved by unanimous consent of the [TICs]," but would be considered approved, absent an express notice of rejection. (PPM 74.) In the event of such a rejection, the lease would not be authorized, and the property manager would have no authority to execute the proposed lease. (Management Agreement §§ 1.2, 2.6.2.) Any unilateral right under the Management Agreement to refuse a lease must be read in conjunction with the TIC Agreement, which restricts a TIC's right to act on behalf of other TICs or to bind other TICs. (TIC Agreement ¶ 1.5.)

120. The Management Agreement also provided for an annual budget that would control capital expenditures and would be deemed approved, absent a notice of objection by a majority of the TICs. (PPM 74–75; Management Agreement § 2.5.1.)

121. The reservation of powers to the TICs in the various agreements does not alone, however, necessarily mandate a conclusion that the purchases do not qualify as an investment contract. Case law recognizes that for control to be relevant, the control must be actual rather than theoretical, and must take economic realities into consideration. *See SEC v. Merch. Capital, LLC*, 483 F.3d 747, 755–65 (11th Cir. 2007) (citing and adopting *Williamson v. Tucker*, 645 F.2d 404, 422 (5th Cir. 1981) (identifying three instances in which a partnership interest may qualify as an "investment contract" because of limitations on control otherwise afforded to a

general partner)).  *See generally* David Rich, Note, *Betting the Farm: The TIC Turf War and Why TICs Constitute Investment Contracts Under Federal Securities Laws*, 1 Wm. & Mary Bus. L. Rev. 451, 481–82 (2010) (noting that potential power can be "illusory" and may not defeat a finding that an investment qualifies as an investment contract).

122.    When restricting its consideration to the pleadings and documents attached to or incorporated in the pleadings, the Court properly denied Highwoods' and TLG's Rule 12(b)(6) motions in its February 2013 Decision.  It is now appropriate for the Court to further review the effect of the reserved control based on the developed record, because the manner in which those reserved powers were exercised may be properly considered in determining the expectations held at the time of purchase.

123.    The securities laws certainly consider the degree of control a relevant inquiry to their scope and application.  *See, e.g.*, *Tolentino v. Mossman*, No. 6:08-cv-2027 EJM, 2009 U.S. Dist. LEXIS 99082, at *12 (N.D. Iowa Oct. 23, 2009); *First Fin. Fed. Sav. & Loan Ass'n v. E.F. Hutton Mortg. Corp.*, 652 F. Supp. 471, 476 (W.D. Ark.), *aff'd*, 834 F.2d 685 (8th Cir. 1987); *Inforex Corp., N.V. v. MGM/UA Entm't Co.*, 608 F. Supp. 129, 133 (C.D. Cal. 1984).  The ultimate determination of whether an investment is a securities transaction cannot be reduced to a rigid formula; rather, in making that determination, "form should be disregarded for substance[,] and the emphasis should be on economic reality." *United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 848 (1975) (quoting *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967)).

124.     Part of the economic reality here is that Plaintiffs made their investment in 2007, at a time when the Durham Property was fully leased through at least 2009, and before the economic conditions caused by the Great Recession beginning in 2008 had set in.  As a result of the economic conditions and Duke's decision to relocate, Plaintiffs sought to minimize their losses by exercising certain rights granted to them in the transactional documents.  Highwoods relies upon the TICs' exercise of those rights in contending that the control reserved to the TICs precludes their investment from being characterized as securities under the Securities Act.

125.     Highwoods contends that for Plaintiffs to claim that they purchased an investment contract, Plaintiffs could not have been afforded, and would not have been allowed to exercise, the degree of control that they exercised.  While *Howey* measures a purchaser's expectations at the time of purchase, cases have recognized that the later exercise of reserved rights is properly considered in assessing the degree of an investor's dependency on the control of the promoter at the time of purchase.  *See, e.g.*, *Rivanna Trawlers Unlimited v. Thompson Trawlers, Inc.*, 840 F.2d 236, 242 (4th Cir. 1988) ("[T]he partners not only had the authority under the agreement to manage the business, they exercised this authority and demonstrated that they were not dependent on the irreplaceable skills of others.").

126.     Without cataloguing every fact that Highwoods contends reflects the exercise of control by the TICs, in summary, those actions include forming a special TIC member committee whose agenda included efforts to discharge the property manager, and making demands on the property manager to implement cost controls,

change reporting, modify the overall management structure, and terminate TLG as the local leasing agent. Highwoods points to the success of those efforts, noting that the property manager was in fact removed and a new manager put in place.

127. On these facts, the Court finds the decision of the United States Court of Appeals for the Eleventh Circuit in *SEC v. Merchant Capital, LLC* particularly instructive. 483 F.3d 747. There, the court found that general partnership interests were investment contracts under federal securities laws. *Id.* at 755–56.

128. In *Merchant Capital*, two individuals formed Merchant Capital to buy, collect, or resell charged-off consumer debt, and then sold interests in multiple registered limited-liability partnerships ("LLP"). *Id.* at 750. The SEC claimed, and the founding partners denied, that the interests were investment contracts. *Id.* Through those interests, purchasers were general partners in one of the various LLPs, but were advised that their participation was expected to be limited to "checking a box" on forms that would be sent to them from time to time. *Id.* at 752. Purchasers of a partnership interest in one LLP were not advised that there were other LLPs and that funds from the various sales would be pooled. *Id.* While a high percentage of purchasers claimed to have significant business experience, none had particular expertise in the debt-collection business. The selling entity was the sole managing general partner for all the LLPs.

129. The *Merchant Capital* court acknowledged the presumption that a general partnership interest is not an investment contract because a general partner typically takes an active role in management, *see Williamson*, 645 F.2d at 422, but

declined to apply that presumption to the facts of the case before it, *Merch. Capital*, 483 F.3d at 765. Instead, the court held that "[a]n interest . . . does not fall outside the definition of investment contract merely because the purchaser has some nominal involvement with the operation of the business," and that "the focus is on the dependency of the investor on the entrepreneurial or managerial skills of a promoter or other party." *Merch. Capital*, 483 F.3d at 755 (quoting *Gordon v. Terry*, 684 F.2d 736, 741 (11th Cir. 1982)). Accordingly, even "[a] general partnership interest may qualify as an investment contract if the general partner in fact retains little ability to control the profitability of the investment." *Id.* The court further noted that it examines not only control that might be provided by the legal documents, but also representations made to the investor. *Id.*

130. The *Merchant Capital* court adopted the Fifth Circuit's decision in *Williamson v. Tucker*, which held that retained control would not prevent an investment from qualifying as an investment contract in three situations: (1) where "an agreement among the parties leaves so little power in the hands of the partner or venturer that the arrangement in fact distributes power as would a limited partnership," (2) where "the partner or venturer is so inexperienced and unknowledgeable in business affairs that he is incapable of intelligently exercising his partnership or venture powers," or (3) where "the partner or venturer is so dependent on some unique entrepreneurial or managerial ability of the promoter or manager that he cannot replace the manager of the enterprise or otherwise exercise

meaningful partnership or venture powers." *Id.* (quoting *Williamson*, 645 F.2d at 424).

131.    Finally, the *Merchant Capital* court concluded that other factors supported a finding that the plaintiffs, although nominal general partners, had purchased investment contracts that were more in the nature of limited partnership interests. *Id.* at 757. The following factors negated the control adequate to defeat a finding that the plaintiffs purchased investment contracts: (1) the partners' ability to elect the managing general partner was not meaningful, because the vote had to be made at the time of investment, and the promoter was the only nominee; (2) the limitation on removing the managing general partner for cause by unanimous vote effectively meant that the managing general partner could not be removed; (3) the various investors were geographically diverse and had no meaningful opportunity to develop relationships; (4) the investors' potential liability was limited to the amount that each investor invested, with no vicarious liability for the acts of other investors; (5) the right to approve expenditures, while facially significant, was diluted by the managing general partner's ability to control information; and (6) the investors had no particular expertise in the business in which they invested. *Id.* at 757–59.

132.    While *Merchant Capital* is not binding on this Court, the decision is instructive in fashioning the nature of the factual inquiry that must be made.

133.    Here, the interests sold were nominally limited partnership interests rather than general partnership interests, which creates a presumption in favor of finding an investment contract. The promoter, Triple Net, clearly stressed that the

TICs were buying securities and investing in reliance on the manager's efforts. But Highwoods offers evidence that arguably cuts against that presumption and suggests that the TICs retained and ultimately exercised a degree of contractual control over their investment inconsistent with that of a typical limited partner, which weighs against finding an investment contract. *See, e.g., Maritan v. Birmingham Props.*, 875 F.2d 1451, 1459 (10th Cir. 1989) (recognizing that, while the inquiry under a *Howey*-based test focuses on intent at the time of purchase, subsequent facts may "shed[ ] light on how the [plaintiff] regarded [his or her] rights and status under the agreement all along").

134. The Court concludes that the exercise of control by the TICs after the collapse of the Business Plan is inadequate to prevent their investment from qualifying as a securities transaction. Accordingly, Highwoods' Motion for Partial Summary Judgment is DENIED, and summary judgment is GRANTED for Plaintiffs on this issue.

## D. Claims under the Securities Act Are Limited to Claims Brought by the North Carolina Plaintiffs.

135. The Securities Act applies "to persons who sell or offer to sell [securities] when (i) an offer to sell is made in this State, or (ii) an offer to buy is made or accepted in this State." N.C. Gen. Stat. § 78A-63(a) (2015).

136. In their 12(c) Motions, Highwoods and TLG move for judgment on the pleadings to dismiss the claims of the fifty-five Out-of-State Plaintiffs in this litigation on the grounds that those Plaintiffs did not receive or accept an offer to sell in North Carolina, and because Triple Net is not a North Carolina company. (*See*

Highwoods' 12(c) Mot. Ex. 1; TLG's 12(c) Mot. Ex. 1.)  The Rule 12(c) Motions do not challenge the claims of the six North Carolina Plaintiffs.

137.    An offer to sell is "made in this State," regardless of "whether . . . either party is then present in this State, when the offer (i) originates from this State or (ii) is directed by the offeror to this State and received at the place to which it is directed (or at any post office in this State in the case of a mailed offer)."  N.C. Gen. Stat. § 78A-63(c).

138.    An offer is accepted "when acceptance (i) is communicated to the offeror in this State and (ii) has not previously been communicated to the offeror, orally, or in writing, outside this State."  *Id.* § 78A-63(d).  "[A]cceptance is communicated to the offeror in this State, whether or not either party is then present in this State when the offeree directs it to the offeror in this State reasonably believing the offeror to be in this State and it is received at the place to which it is directed (or at any post office in this State in the case of a mailed acceptance)."  *Id.*

139.    On the purchase side of the transaction, only three TIC owners allege that they received an offer to purchase in North Carolina.  (Compl. ¶¶ 169, 217, 220.) Each of the other TIC owners who is a Plaintiff in this litigation alleges that they received the PPM prior to closing, but they do not allege that they accepted any offer in North Carolina.  (Compl. ¶¶ 134–223.)

140.    On the sale side of the transaction, the offer to sell originated in California, where Triple Net and NNN Capital were located.  (Compl. Ex. F, at 48–49.)  Plaintiffs do not allege that any offer to sell originated in North Carolina.  Other

than the North Carolina Plaintiffs, no Plaintiff alleges that an offer to buy was made or accepted in North Carolina. (*See* Compl. ¶¶ 134–223.)

141. While Plaintiffs do not allege where they communicated acceptance of their offers to purchase, the Complaint reveals that Triple Net advised the SEC that the offers were accepted in California. (Compl. ¶ 100 & Ex. M.) The PPM required Plaintiffs to send their acceptances to NNN Capital in California. (PPM 3, 48, 49.) There is no allegation to the contrary.

142. Highwoods and TLG contend that each Plaintiff must independently satisfy the Securities Act's offer-or-acceptance requirement. Plaintiffs argue that the Securities Act's requirement of a North Carolina-based offer or sale is a jurisdictional requirement, and that once that jurisdictional requirement is met for one Plaintiff, it is satisfied for all Plaintiffs. This is because the purpose of section 78A-63, as a remedial statute designed to protect the integrity of North Carolina's marketplace, is to ensure only that a nexus exists between North Carolina and the securities transaction at issue. Plaintiffs contend that once that nexus is demonstrated, the Securities Act must be read liberally to afford a statutory claim to any securities purchaser in that transaction, even if one or more of the purchasers could potentially pursue an alternative claim under another state's securities laws.

143. The Court concludes that Defendants correctly construe section 78A-63 to limit claims under the Securities Act to those Plaintiffs that received or accepted an offer to sell in North Carolina.

144. The Court further concludes that the transfer of title in North Carolina from Triple Net to the TICs for property located in North Carolina did not itself constitute a sale of securities within North Carolina, and was neither the offer nor the acceptance for the sale of a security in North Carolina for any Plaintiff other than the North Carolina Plaintiffs.

145. The Court finds little guidance in case law or legislative history as to legislative intent regarding whether the scope of the Securities Act should extend to out-of-state purchasers if the overall transaction has a North Carolina nexus. The Court must determine that intent from the language of the statute, considering relevant policies implicated by that language. The parties each invoke policy arguments regarding the legislative intent of the Securities Act.

146. Plaintiffs draw on a canon of statutory construction that favors a broad construction of statutes intended to protect against public harm. They argue that the Securities Act is a remedial statute intended to protect the integrity of North Carolina as a marketplace for securities, and that it must follow that any securities offeror that enters the North Carolina marketplace must be exposed to the full breadth of the Act's remedial provisions, such that any purchaser in the transaction has a cause of action for any misrepresentation, as long as the transaction, as here, has a clear nexus to North Carolina. The argument is similar to one typically made by a plaintiff to assert that a defendant should be subject to general as opposed to specific personal jurisdiction. Plaintiffs contend that Defendants' narrow construction would allow fraud with a North Carolina nexus to go without a remedy for anyone other than a

North Carolina resident, and that such a narrow holding does not promote the integrity of North Carolina as a marketplace.

147. In making their policy argument, Defendants invoke the canon of statutory construction that a statute should not be presumed to have extraterritorial effect without a clear expression of legislative intent. Defendants respond that Plaintiffs' broad construction of the Securities Act would lead to an absurd burden on North Carolina courts, because that construction necessarily means that every purchaser from any state involved in a multistate transaction would be granted a statutory claim under the Securities Act, as long as a single offer or purchase was made in North Carolina. Defendants insist that no such intent is obvious or can be reasonably inferred from the statutory language. They further argue that their position is consistent with the fact that North Carolina takes an approach to secondary liability that varies from the approach taken by other states and the Uniform Securities Act, and that as a result, Plaintiffs' construction would allow out-of-state residents to enjoy a broader remedy than they are given by the securities laws of their respective home states.

148. Determining the scope of the Securities Act is an undertaking that is separate from resolving a conflict-of-laws issue. The parties agree that the securities laws of multiple states may apply to a single transaction. *See Simms Inv. Co. v. E.F. Hutton & Co.*, 699 F. Supp. 543, 545 (M.D.N.C. 1988). An election of remedies may be presented when more than one state's securities laws apply to a single transaction. *Id.* at 546. Multiple plaintiffs may be joined in a single lawsuit brought in a state

that has a "sufficient territorial nexus" to the transaction. *Id.* But it does not follow that all purchasers in a transaction that have a nexus to one state are extended a remedy under the laws of that state as opposed to the laws of the state where the sale took place.

149. Plaintiffs seek to bolster their statutory interpretation by referring to the North Carolina choice-of-law provision that appears in both the TIC Agreement and the Management Agreement. (TIC Agreement § 12.5; Management Agreement § 13.5.) While a choice-of-law provision may control which states' laws govern contractual matters, the Court is unwilling to conclude that the parties can contractually create a cause of action under a state's statute when the statute does not by its own terms afford such a cause of action. If the dispute were whether the overall transaction has some nexus to North Carolina, the choice-of-law provision might be instructive. But the question whether each purchaser in a securities transaction has a cause of action under the Securities Act does not turn on whether the transaction has a nexus to North Carolina; rather, it turns on the statutory language that requires the cause of action to be grounded on an offer or acceptance in North Carolina.

150. In sum, the Court concludes that only the six North Carolina Plaintiffs in this litigation may pursue claims under the Securities Act. Accordingly, the Court GRANTS the 12(c) Motions and enters judgment in favor of Defendants in this litigation on the Securities Act claims brought by the fifty-five Out-of-State Plaintiffs.

151. At the hearing on the 12(c) Motions, Plaintiffs argued that they should be allowed to amend their pleadings to assert claims under the securities laws of other states if the Court grants Highwoods' Motion for Partial Summary Judgment. Defendants countered that an amendment should be denied, not only because of the prejudice inherent in such a late filing, but because an amendment would be futile for at least two reasons: (1) claims against Highwoods and TLG are limited to claims of secondary liability, which would not be recognized under a majority of state securities laws through which Plaintiffs could bring claims, and (2) an amendment should not be allowed to relate back, so the various state statutes of limitation would bar Plaintiffs' claims. Plaintiffs counter that Highwoods and TLG should be estopped from asserting prejudice because they did not promptly raise their Rule 12(c) arguments.

152. Plaintiffs have not followed with a formal motion to amend, nor have they tendered an amended pleading to assert claims under other states' securities acts.

153. The Court now dismisses with prejudice all claims under the Securities Act brought by anyone other than the North Carolina Plaintiffs. As to the Out-of-State Plaintiffs, the Court is not satisfied that Plaintiffs' statements at the hearings in this matter qualify as an effective motion to amend to assert claims based on the securities laws of other states. But out of an abundance of caution, in the event that an appellate court were to determine that the Court is required to consider an amendment under Rule 15, the Court would then be required to consider a multitude

of issues, including but not limited to whether any amendment would be untimely and prejudicial, if not futile. Considering the number of different state securities laws that could conceivably be involved, the Court will not further consider the issue without a formal motion and full briefing. The Court does not here preclude Plaintiffs from filing a motion to amend, but it certainly intends to express no opinion that leave to amend should or will be freely given.

E. **The Settlement Agreement Did Not Release Claims in this Litigation Against the Grubb & Ellis Defendants.**

154. The Grubb & Ellis Defendants move for summary judgment in their favor on the basis that Plaintiffs released all claims against them. Plaintiffs, in turn, request summary judgment in their favor on this issue on the grounds that the conditional-release provision in the Settlement Agreement is not effective as a matter of law.

155. Plaintiffs and the Grubb & Ellis Defendants entered into the Settlement Agreement in March 2010. The Settlement Agreement contains provisions that conditionally agreed to release from liability Triple Net and "any related entity that has management responsibilities to [Plaintiffs]." (Settlement Agreement 1.)

156. Assuming those conditions were met, the Settlement Agreement released all claims

> including but not limited to, any and all claims arising from or related to the underwriting and acquisition of the [Durham] Property, the securities offering documents and disclosures for the sale of [TIC] interests in the [Durham] Property, the Management Agreement, the [TIC] Agreement, the termination of any such agreements, [or] the management of the [Durham] Property.

(Settlement Agreement ¶ 2.1.)

157.    The release in the Settlement Agreement was conditioned as follows:

[T]he release . . . [is] subject to and conditioned upon the absence of any claims by [Plaintiffs] asserted against the Grubb & Ellis [Defendants] prior to July 2, 2010 (the "Effective Date of Release"). The [Plaintiffs] shall have until the Effective Date of Release to conduct such inquiries and investigations as they may determine to be necessary or appropriate . . . to determine whether . . . they have a viable claim against any of the Grubb & Ellis [Defendants]. Should any of the [Plaintiffs] discover such a claim, they shall give written notice to Grubb & Ellis of such claim (an "Excluded Claim") prior to the Effective Date of Release, including a description of the basis of such claim in reasonable detail, and they shall commence an action or arbitration proceeding with regard to such Excluded Claim prior to the Effective Date of Release. Should the [Plaintiffs] duly and timely assert an Excluded Claim prior to the Effective Date of Release . . . the [release] shall be void and of no force and effect with respect to the Excluded Claim . . . .

(Settlement Agreement ¶ 2.4 (stylistic emphasis omitted).)

158.    Plaintiffs commenced the Grubb & Ellis Lawsuit on July 1, 2010, by filing a Rule 3 summons. (Grubb & Ellis Defs.' Summ. J. Ex. 36.) However, the Rule 3 summons was not served on the Grubb & Ellis Defendants until July 12, 2010. (Grubb & Ellis Defs.' Summ. J. Ex. 35, at 1.) The Rule 3 summons provided minimal detail about Plaintiffs' claims, and Plaintiffs did not provide written notice of their claims to the Grubb & Ellis Defendants prior to serving the summons. Plaintiffs' Complaint was filed on July 21, 2010.

159.    The Grubb & Ellis Defendants' Motion for Summary Judgment is controlled by the Court's interpretation of paragraph 2.4 of the Settlement Agreement.

160. Relying on the first sentence of paragraph 2.4 as an independent statement, Plaintiffs contend that the filing of the Rule 3 summons was alone effective to preclude any release from becoming effective. The Grubb & Ellis Defendants contend that this first sentence cannot be read independently, but that paragraph 2.4 must be read as a whole, and when read as a whole, the release would become effective on July 2, 2010, unless each of two things happened before July 2, 2010: (1) Plaintiffs gave written notice of their intent to file a lawsuit, "including a description of the basis of such claim[s] in reasonable detail," and (2) Plaintiffs filed a lawsuit asserting the identified claims. (Settlement Agreement ¶ 2.4.) The Grubb & Ellis Defendants urge that the filing of the Rule 3 summons may have satisfied the second condition, but that it manifestly did not satisfy the first condition.

161. The Court concludes that it must interpret paragraph 2.4 restrictively, and in doing so concludes that the first sentence of that paragraph is an independent sentence that effectively precluded the release from becoming effective once Plaintiffs initiated their action on July 1, 2010. *See Johnston County v. R.N. Rouse & Co.*, 331 N.C. 88, 94, 414 S.E.2d 30, 34 (1992) ("[I]t is a fundamental rule of contract construction that the courts construe an ambiguous contract in a manner that gives effect to all of its provisions, if the court is reasonably able to do so.").

162. Accordingly, solely on the issue whether Plaintiffs' claims against the Grubb & Ellis Defendants were released by the Settlement Agreement, the Court denies the Grubb & Ellis Defendants' request for summary judgment and instead grants summary judgment for Plaintiffs.

## F. The North Carolina Plaintiffs' Claim of Primary Liability under the Securities Act Survives as to Some Grubb & Ellis Defendants, but Not to Others.

163. Having determined that the North Carolina Plaintiffs have standing to present claims under the Securities Act, the Court now addresses whether those Plaintiffs have demonstrated a basis to further pursue a claim of primary liability against the Grubb & Ellis Defendants.

### (1) All claims against Grubb & Ellis Co. and NNN Realty Advisors are dismissed.

164. To be held primarily liable under the Securities Act, a defendant must have offered or sold a security. N.C. Gen. Stat. § 78A-56(a)(1), (2) (2015).

165. Plaintiffs concede that Grubb & Ellis Co. should be dismissed from this litigation. (Pls.' Mem. Opp'n to Grubb & Ellis Defs.' Mot. Summ. J. 24 ("Plaintiffs concede that they have not discovered evidence in this litigation that Grubb & Ellis Company assumed the liabilities of its subsidiaries or participated in the transaction.").) Accordingly, all claims against Grubb & Ellis Co. are DISMISSED.

166. NNN Realty Advisors contends that it, too, should be dismissed from this litigation because it was merely the parent company of Triple Net and NNN Capital.

167. As a preliminary matter, NNN Realty Advisors filed a petition for assignment for the benefit of creditors on August 14, 2015. *See* Petition for Assignment for Benefit of Creditors, *In re NNN Realty Advisors, Inc.*, No. CACE-15-014636 (Fla. Cir. Ct. Aug. 14, 2015). That case is presently pending in the Complex Civil Litigation Division of the Seventeenth Judicial Circuit for Broward County,

Florida. At this Court's November 2015 hearing, counsel advised that the claims in this litigation against NNN Realty Advisors should be stayed due to a Chapter 7 involuntary-bankruptcy filing in the United States Bankruptcy Court for the District of Delaware. *See* Involuntary Petition, *In re NNN Realty Advisors, Inc.*, No. 15-11873-KJC (Bankr. D. Del. Sept. 8, 2015). The bankruptcy case was later transferred to the United States Bankruptcy Court for the Southern District of Florida, where that court granted NNN Realty Advisors' motion to dismiss and motion for abstention. *See In re NNN Realty Advisors, Inc.*, No. 15-30508-RBR, slip op. at 7 (Bankr. S.D. Fla. Apr. 18, 2016). Therefore, it is no longer necessary for this Court to stay the litigation against NNN Realty Advisors.

168. NNN Realty Advisors contends that claims against it should be dismissed because, as the parent company, it did not play any substantive role in Plaintiffs' purchases of TIC interests in the Durham Property and thus should not be considered an offeror or seller of a security purchased by any Plaintiff.

169. Plaintiffs contend that NNN Realty Advisors is subject to liability because it is a signatory to the Management Agreement, the LLC Agreement, and the TIC Agreement, and was the indemnitor that executed the Indemnity and Guarantee Agreement with the lender in connection with the investment. NNN Realty Advisors signed as an authorized representative of NNN Office in those agreements. Plaintiffs further contend that NNN Realty Advisors is liable based on control-person liability as the controlling shareholder of Triple Net and NNN Capital.

*See* N.C. Gen. Stat. § 78A-56(c)(1) (imposing secondary liability on control persons who materially aid in a securities sale).

170. The record presents no basis for the Court to conclude that NNN Realty Advisors offered or sold a security, made any statements to Plaintiffs, entered into contracts with Plaintiffs, or shared contractual privity with Plaintiffs. Accordingly, NNN Realty Advisors' liability, if any, must depend on control-person liability.

171. The Court is not persuaded that Plaintiffs have presented an adequate basis to pursue claims against NNN Realty Advisors based on a theory of control-person liability. The fact that NNN Realty Advisors affixed its signature to the various transactional documents is not enough to sustain a claim for control-person liability under the Securities Act. The record reveals no stronger basis to uphold Plaintiffs' claim under a control-person theory of liability—a claim that they raise for the first time in their response brief to the Grubb & Ellis Defendants' Motion for Summary Judgment. Accordingly, all claims against NNN Realty Advisors are DISMISSED.

(2) **Material questions of fact preclude summary adjudication of the North Carolina Plaintiffs' primary-liability claim against the remaining Grubb & Ellis Defendants.**

a. **The legal standard for liability based on a stated opinion**

172. The Court now addresses the North Carolina Plaintiffs' claim of primary liability under the Securities Act against the remaining Grubb & Ellis Defendants— Triple Net, NNN Capital, and NNN Office. Like with NNN Realty Advisors, an assignment-for-the-benefit-of-creditors proceeding is pending against Triple Net

(now NNN Realty Investors, LLC) in a Florida state court. *See In re NNN Realty Inv'rs, LLC*, No. CACE-15-014067 (Fla. Cir. Ct. filed Aug. 6, 2015). In the absence of a bankruptcy proceeding that would require this action to be stayed, the Court proceeds to rule on claims pending against Triple Net.

173. The Securities Act imposes primary liability for fraud pursuant to section 78A-56(a)(1), and for materially false statements or omissions in connection with the offer or sale of a security pursuant to section 78A-56(a)(2). N.C. Gen. Stat. § 78A-56(a)(1), (2); *see also Piazza v. Kirkbride*, ___ N.C. App. ___, 785 S.E.2d 695, 709 (2016), *appeal docketed*, No. 181A16 (N.C. May 10, 2016).

174. Subsection (a)(1) is modeled on section 10(b)(5) of the federal 1934 Exchange Act and requires proof of scienter and justifiable reliance. *See* N.C. Gen. Stat. § 78A-56(a)(1); *see also Piazza*, 785 S.E.2d at 709; *Highwoods*, 2013 NCBC LEXIS 11, at *29. Subsection (a)(2) is modeled on section 12 of the federal 1933 Securities Act and requires proof of "any untrue statement of a material fact or any omission to state a material fact," rather than scienter or justifiable reliance. N.C. Gen. Stat. § 78A-56(a)(1); *see also Piazza*, 785 S.E.2d at 709–10; *Highwoods*, 2013 NCBC LEXIS 11, at *29–30.

175. North Carolina's appellate courts have defined an omitted fact as "material" when "there is a substantial likelihood that a reasonable [investor] would consider [the omitted fact] important in deciding" whether to invest. *Ehrenhaus v. Baker*, 216 N.C. App. 59, 88, 717 S.E.2d 9, 28 (2011) (quoting *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985)). That is, "there must be a substantial likelihood

that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id.* at 88, 717 S.E.2d at 28–29 (quoting *Rosenblatt*, 493 A.2d at 944).

176. When a plaintiff establishes a prima facie case under section 78A-56(a)(2), the burden of proof shifts to the defendant to prove "that he did not know, and in the exercise of reasonable care could not have known, of the untruth or omission." N.C. Gen. Stat. § 78A-56(a)(2); *see Piazza*, 785 S.E.2d at 711 (holding that the "reasonable care" standard in section 78A-56(a)(2) "appears to be more similar to a negligence standard than intentional fraud"); *Highwoods*, 2013 NCBC LEXIS 11, at *30.

177. Having thoroughly reviewed the extensive record, and having considered the arguments and authorities cited, the Court concludes that Plaintiffs have not demonstrated a basis for any finding of scienter. Accordingly, any Securities Act claim against the Grubb & Ellis Defendants must be based on subsection (a)(2).

178. Plaintiffs' claim concentrates on statements or omissions regarding the likelihood that Duke would renew its leases. The record is clear that both the TICs and Triple Net considered the income stream from Duke's lease renewals to be a significant component of the PPM's projected Business Plan. Thus, that income stream was a material component, and any misrepresentation concerning that income stream was also material.

179. The parties do not appear to disagree as to the income stream that the Duke leases represent. Rather, the issue of liability turns on whether Plaintiffs have

developed or projected evidence on which a conclusion could be made that Triple Net made a misrepresentation concerning the likelihood of Duke's lease renewal, either by affirmatively misstating the likelihood of that renewal or by omitting facts of which Triple Net was or should have been aware that, when not disclosed, rendered the statements misleading.

180. The PPM clearly disclosed that Duke's leases would expire and had no renewal provisions, and further clearly disclaimed any warranty that Duke would in fact renew the leases. (PPM 9.) Liability then turns on whether statements made regarding the leases were misleading because other facts regarding those leases and circumstances relevant to the probability of their renewal were not disclosed, including the expressed opinion that Triple Net itself believed that Duke would renew its leases.

181. In their claim against the Grubb & Ellis Defendants, Plaintiffs alternatively contend that Triple Net failed to disclose facts of which it was aware, and that Triple Net further failed to discover and subsequently disclose facts that it should have discovered. As an example of Plaintiffs' claim that Triple Net failed to disclose material facts that it was aware of, Plaintiffs point to Selig's testimony that he advised Waddell that Duke had issued an RFP for an alternative build-to-suit building to relocate PRMO's operations because of Duke's dissatisfaction with their space in the Durham Property. As an example of Plaintiffs' claim that the Grubb & Ellis Defendants failed to discover and disclose material facts, Plaintiffs assert that Triple Net failed to conduct adequate due diligence that would have uncovered

Highwoods' build-to-suit proposal. In their claim of secondary liability against Highwoods and TLG, Plaintiffs assert that Highwoods and TLG failed to disclose these facts to Triple Net.

182. The Grubb & Ellis Defendants contend that Triple Net's statements regarding the probability that Duke would renew its leases in the Durham Property are nonactionable forward-looking statements of opinion, and that the additional facts that Triple Net failed to become aware of are insufficient to make those statements actionable under the Securities Act.

183. There is little precedent decided under North Carolina's Securities Act to guide the Court. Accordingly, the Court properly looks to federal precedent for guidance. Doing so begins with considering the United States Supreme Court's decision in *Omnicare, Inc. v. Laborers District Counsel Construction Industry Pension Fund*, 135 S. Ct. 1318 (2015). Before *Omnicare*, at least some federal courts of appeals held that a plaintiff could prevail on a misrepresentation claim grounded on a defendant's statement of opinion only if the plaintiff could prove both that the opinion was objectively false and that the defendants did not actually believe the stated opinion. *See, e.g.*, *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 111–12 (2d Cir. 2011). The Second Circuit Court of Appeals has held that this earlier standard was modified by *Omnicare*, because the Supreme Court now recognizes liability based on an opinion that applies facts on which the opinion is based, if the opinion is proven to be objectively false and omits information that renders the opinion misleading, even

if the party sincerely held the opinion at the time it was made. *Tongue v. Sanofi* (*In re Sanofi Sec. Litig.*), 816 F.3d 199, 210 (2d Cir. 2016).

184. In *Omnicare*, the United States Supreme Court addressed the question of liability under section 11 of the Securities Act of 1933 for statements of opinion contained in a company's offering documents. Omnicare, a pharmacy-services company, filed a registration statement in connection with a public offering of common stock. *Omnicare*, 135 S. Ct. at 1323. The registration statement contained a statement that expressed Omnicare's opinion that the company's registration statement complied with federal and state laws. *Id.* at 1323–24. The respondents alleged that Omnicare's statements of legal compliance constituted both untrue statements of material fact and omissions of material fact. *Id.* at 1324.

185. The Court's discussion highlights a distinction between statements of pure opinion and mixed statements of fact and opinion. The Court established a two-step process for analyzing potential securities liability. *Id.* at 1325. First, a court should inquire whether "an opinion itself constitutes a factual misstatement." *Id.* Second, if so, the court should then determine "when an opinion may be rendered misleading by the omission of discrete factual representations." *Id.*

186. As to the first step, the Supreme Court noted that a statement of opinion does not constitute an "untrue statement of fact" simply because the stated opinion ultimately proves incorrect. *Id.* at 1326. Rather, the Court held that "a sincere statement of pure opinion is not an 'untrue statement of material fact,' regardless whether an investor can ultimately prove the belief wrong." *Id.* at 1327. The Court

carefully explained, however, that "liability under § 11's false-statement provision would follow . . . if the speaker did not hold the belief she professed" or "if the supporting fact she supplied were untrue." *Id.* The reach of section 11 is limited in that it "does not allow investors to second-guess inherently subjective and uncertain assessments." *Id.* In other words, the Court explained, section 11's false-statement provision is not "an invitation to Monday morning quarterback an issuer's opinion." *Id.*

187. As to the second step, the Court explained that statements could be misleading under section 11 if they *omitted* "material facts about the issuer's inquiry into or knowledge concerning a statement of opinion, and if those facts conflict with what a reasonable investor would take from the statement itself." *Id.* at 1329. The Court expressly rejected the argument that an opinion can never constitute a misrepresentation. *Id.* at 1328. Rather, the Court explained that "a reasonable investor may, depending on the circumstances, understand an opinion to convey facts about how the speaker has formed the opinion . . . . [a]nd if the real facts are otherwise, but not provided, the opinion statement will mislead its audience." *Id.*

188. The Supreme Court was careful to limit the scope of its holding, explaining that an opinion "is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way." *Id.* at 1329. Indeed, the Court explained, "[r]easonable investors understand that opinions sometimes rest on a weighing of competing facts," and "the presence of such facts is one reason why an issuer may frame a statement as an opinion, thus conveying uncertainty." *Id.*

189. Thus, under *Omnicare*, to state a claim under section 11, the investor "must identify particular (and material) facts going to the basis for the issuer's opinion—facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Id.* at 1332. As the Supreme Court points out, "[t]hat is no small task for an investor." *Id.*

190. The difficulty that a plaintiff faces in meeting the *Omnicare* standard is reflected in the Second Circuit's opinion in *Sanofi*. Issued in March 2016, *Sanofi* was the first federal appellate-court decision to discuss *Omnicare* in detail.

191. In *Sanofi*, the plaintiffs alleged that Sanofi, a pharmaceutical company, made materially false or misleading statements regarding its breakthrough drug Lemtrada and the chances that the drug would receive FDA approval, when the company was aware that the FDA had expressed concerns with Sanofi's reliance on single-blind studies. *Sanofi*, 816 F.3d at 202.

192. In affirming the trial court's dismissal of the plaintiff's federal securities claims, the Second Circuit echoed the Supreme Court's emphasis in *Omnicare* that investors must examine the factual context in which an allegedly misleading opinion is made. *Id.* at 211. The court was persuaded by the fact that the plaintiffs were sophisticated investors who were familiar with the customs and practices of the relevant industry. *Id.*; *see id.* at 211–12 ("While a layperson, unaccustomed to the subtleties and intricacies of the pharmaceutical industry and registration statements, may have misinterpreted Defendants' statements as evincing assurance

of success, Plaintiffs here can claim no such ignorance."). However, the court further noted that the offering materials contained numerous caveats as to the reliability of the projections that a "reasonable investor" would have considered. *Id.* at 211. The court granted the defendants' motion to dismiss the plaintiffs' claim at the pleading stage, amplifying *Omnicare*'s teaching that "[i]ssuers must be forthright with their investors, but securities law does not impose on them an obligation to disclose every piece of information in their possession." *Id.* at 214.

### b. There are issues of material fact as to whether Triple Net's opinion constitutes an actionable misstatement.

193.    Plaintiffs contend that Triple Net's statements regarding the probability of Duke's lease renewals, although expressed as an opinion, implied facts upon which the opinions were based, and were misleading because Plaintiffs were not advised of facts known to—or that should have been known to—Triple Net, thereby causing the opinions to be misleading. Particularly, Plaintiffs assert that the stated percentage probabilities in the ARGUS presentation and the stated opinion that Triple Net believed that Duke would renew based on the lease history were misleading when Plaintiffs were not advised that Duke had already expressed reservations about the leased space and had taken actions directed at relocating when the leases expired. Plaintiffs further claim that the materiality of this information would be even more obvious if Triple Net had learned but failed to disclose that Highwoods had participated in those efforts by issuing a build-to-suit proposal at the same time it was marketing the Property for sale to Triple Net.

194.    The Grubb & Ellis Defendants rely heavily on case law developed prior to *Omnicare* holding that liability under securities laws should not rest on forward-looking statements accompanied by cautionary language. *See, e.g., Gasner v. Bd. of Supervisors*, 103 F.3d 351, 364 (4th Cir. 1996); *Raab v. Gen. Physics Corp.*, 4 F.3d 286, 290 (4th Cir. 1993); *In re Donald J. Trump Casino Sec. Litig.—Taj Mahal Litig.*, 7 F.3d 357, 371–73 (3d Cir. 1993). Applying those holdings, the Grubb & Ellis Defendants highlight that any statement regarding the probability of Duke's lease renewal was necessarily forward-looking and was accompanied by abundant disclaimers cautioning that Plaintiffs should not invest based on any assurances that the stated assumptions of lease renewal would prove true, and that Duke's failure to renew would necessarily undercut the success of the Business Plan. It is important to focus on the exact language of the critical opinion. In addition to using certain probability percentages to project a cash-flow analysis, Triple Net expressed the following opinion:

> Based on Duke's longevity as a tenant at the Property, the Manager believes that Duke will continue to renew each of their leases for a variety of reasons. Most notably is the Property's location to Durham Regional Hospital and Duke University. Durham Regional Hospital is located approximately one-half mile to the south while Duke University is approximately 7 miles away. The lack of new and existing available office space large enough to handle the square footage needs of the PRMO Group and Pediatric group further supports this.
>
> Based upon the importance of Duke's tenancy to the Property, the Manager intends to engage Duke regarding extending their respective leases. This will help reduce the uncertainty surrounding the expiration of their leases over the first three years of the projected five year holding period. However, there can be no assurance that Duke University Health Systems, Inc. or Duke University will in fact extend their leases at the Property.

(PPM 40.)

195. This statement is offered neither as a pure opinion nor as a representation that Duke would in fact renew. The language is properly characterized as an opinion that implies a factual basis. The opinion is accompanied by clear disclaimers that the opinion was not an assurance, and that if the opinion proved wrong in the future, the value of the investment would be undercut substantially, if not totally lost. (*See, e.g.*, PPM i, 19.) While Triple Net committed to using "good faith commercially reasonable efforts to retain existing tenants and/or to re-lease and re-tenant vacant premises in the Property," it expressly advised that "no assurance can be given that [it would] be able to do so." (PPM 9.)

196. Because the PPM clearly reveals that Duke's renewal was uncertain, Plaintiffs must contend that the omission of additional facts rendered Triple Net's opinion misleading, notwithstanding that the opinion was already accompanied by the caution that the opinion could not be considered as providing any assurance, and that Plaintiffs were investing based on a future contingency. Their argument is that additional facts regarding Duke's consideration of a possible relocation would have been material to an investor's consideration of whether the stated contingency would be more likely to fail. That is, Plaintiffs' burden is to show that the omitted additional facts made the expressed opinion "misleading to a reasonable person reading the statement fairly and in context." *Omnicare*, 135 S. Ct. at 1332.

197. Having considered the record, the Court concludes that there is no adequate basis on which a jury could reasonably conclude that Triple Net

misrepresented that Duke had actually decided to renew. First, the PPM does not make that statement. Further, there is no evidentiary basis to reject Selig's clear testimony that no decision to relocate had been made.

198. However, having expressed an affirmative opinion that it believed that Duke would renew, Triple Net cannot defend its statement solely on the basis that Duke had not decided otherwise and that Triple Net reasonably held its stated belief. Liability can rest on an opinion that implies certain facts if there were other facts of which the offeror knew but did not disclose, or facts of which the offeror would be presumed to have known from the manner in which the opinion was based. Here, Plaintiffs highlight that Selig testified that Triple Net was specifically advised that Duke had begun to consider relocating, evidenced by Duke having issued an RFP—a fact that the PPM did not disclose. (Selig Dep. vol. I, 56:19–57:2, 59:1–4, July 3, 2012.) Plaintiffs further contend that Triple Net's due diligence was inadequate, as a result of which Triple Net failed to learn of additional facts that should have been disclosed.

199. Admittedly, the burden on an investor who seeks to impose liability based on an issuer's statement of opinion remains a high one, and the burden is particularly high when a plaintiff relies on an opinion regarding a future occurrence that is accompanied by disclaimers and cautions. Nonetheless, based on this record, the Court concludes that there are material issues of fact that preclude a grant of summary judgment either to the North Carolina Plaintiffs or to the Grubb & Ellis Defendants on the issue of primary liability under the Securities Act pursuant to

section 78A-56(a)(2). The Court reserves reconsideration of its holding upon a motion for directed verdict.

## G. The North Carolina Plaintiffs' Claim of Secondary Liability Against Highwoods and TLG Should Be Dismissed.

200. Having found that the North Carolina Plaintiffs may pursue a primary-liability claim under section 78A-56(a)(2), the Court turns to whether those Plaintiffs may proceed with their claim of secondary liability against Highwoods and TLG. After due consideration of the record, briefs and authorities, and arguments of counsel, the Court concludes that the secondary-liability claim must be dismissed, because the evidence of record, viewed in the light most favorable to Plaintiffs, does not allow for a conclusion that either Highwoods or TLG knew of and then materially aided or substantially assisted in Triple Net's expression of the opinion on which the North Carolina Plaintiffs base their primary-liability claim.

201. The Court first rejects Plaintiffs' argument that the law-of-the-case doctrine precludes it from reviewing the secondary-liability claim because the Court allowed that claim to survive Highwoods' and TLG's initial Rule 12(b)(6) motions to dismiss. *See Highwoods*, 2013 NCBC LEXIS 11, at *57. That doctrine does not preclude the Court's subsequent review of the claim under Rule 56.

202. The Court begins its analysis by examining the relevant portion of the Act on which the secondary-liability claim is based. Section 78A-56(c)(2) provides in pertinent part that

> [u]nless liable under subdivision (1) of this subsection . . . every other
> person who materially aids in the transaction giving rise to the liability
> is also liable jointly and severally with and to the same extent as the

> person if the employee or other person actually knew of the existence of the facts by reason of which the liability is alleged to exist.

N.C. Gen. Stat. § 78A-56(c)(2). The Securities Act imposes two essential elements for secondary liability: (1) the "material aid" requirement, and (2) the "actual knowledge" requirement. *See id.*

203.    In its earlier opinion, the Court determined that "material aid" should be construed to require conduct that rises "to the level of having contributed substantial assistance to the act or conduct leading to primary liability under the [Securities Act]." *Highwoods*, 2013 NCBC LEXIS 11, at \*49. The Court also held that the undefined term "substantial assistance" should be narrowly construed. *Id.* The Court finds a narrow construction appropriate, considering the potential breadth of secondary liability under section 78A-56(c)(2), which imposes joint and several liability on every person who materially aids the primary actor. N.C. Gen. Stat. § 78A-56(c)(2).

204.    Here, Plaintiffs contend that Highwoods and TLG materially aided Triple Net's violation of the Securities Act in two ways.

205.    First, Plaintiffs contend that Highwoods' transfer of fractional interests by deed directly to Plaintiffs was itself "material aid." The Court concludes that the transfer by deed alone did not constitute material aid within the scope of the Securities Act.

206.    Second, Plaintiffs contend that Highwoods and TLG materially aided Triple Net in giving a misleading opinion as to the probability of Duke's lease renewal by failing to advise Triple Net of facts that might have led Triple Net either to express

a different opinion or to disclose additional facts regarding the basis for the opinion that it did express. Even assuming, without deciding, that a person's failure to disclose facts to an offeror of securities could, under a total mix of information, constitute material aid or substantial assistance, under the Securities Act, that material aid or substantial assistance must nevertheless be accompanied by proof that the party charged with secondary liability acted with knowledge of the facts on which the claim of primary liability is based. Plaintiffs cannot satisfy that requirement here, because there is no evidence of record to show that, at the time Highwoods or TLG allegedly provided material aid or substantial assistance, either entity knew that Triple Net intended to make—or use the information sought from Highwoods or TLG to make—the opinion on which Plaintiffs base their primary-liability claim against Triple Net.

207. Essentially, Plaintiffs claim that Highwoods and TLG are secondarily liable because Triple Net relied on them when it expressed its own opinion in the PPM regarding the probability that Duke would renew its leases, and that Highwoods' or TLG's failure to disclose their knowledge of certain facts regarding Duke's consideration of that renewal supports secondary liability, regardless of whether Highwoods or TLG knew that Triple Net intended to use that information to express an opinion to a securities purchaser who might be influenced by Triple Net's awareness or lack of awareness of the facts underlying Triple Net's opinion. That is, according to Plaintiffs, Highwoods and TLG are secondarily liable if they misled Triple Net, as a result of which Triple Net, in turn, misled Plaintiffs, and Plaintiffs

need not prove that Highwoods or TLG knew that Triple Net intended to use the information they provided to mislead Plaintiffs.

208.    The Court has earlier rejected the notion that Plaintiffs can assert a direct fraud-based claim against Highwoods or TLG under a theory of "indirect reliance," and that any fraud-based claim fails because neither Highwoods nor TLG made a direct representation on which any Plaintiff relied in purchasing a TIC interest. *See Highwoods*, 2013 NCBC LEXIS 11, at *58–62. The Court likewise concludes that neither Highwoods nor TLG may be charged with secondary liability, because there is no proof that they "actually knew of the existence of the facts by reason of which the [primary] liability is alleged to exist." N.C. Gen. Stat. § 78A-56(c)(2).

209.    The North Carolina Plaintiffs have offered no evidence that either Highwoods or TLG knew that Triple Net intended to express, or in fact had expressed, the opinion on which the primary-liability claim is based. There is no evidence that Highwoods or TLG directly participated in drafting any representation upon which any North Carolina Plaintiff relied. There is no evidence that Triple Net asked Highwoods or TLG to review, endorse, or comment on any representation that Triple Net intended to make, or in fact made, to the North Carolina Plaintiffs. As cautioned by the United States Supreme Court in *Omnicare*, allowing a securities-law violation to rest on the expression of an opinion should not be read so broadly as to impose a general duty of disclosure. *Omnicare*, 135 S. Ct. at 1329. This caution is particularly appropriate where, as here, the duty of disclosure is asserted not against the

securities offeror, but against one who expressed a separate opinion to the offeror during the offeror's own due diligence.

210. The Court is not required to reach a different conclusion based on evidence that Triple Net may have directly copied into the PPM some background information from the COM that TLG had earlier prepared in connection with Highwoods' marketing of the Durham Property. TLG contends that any such copying was prohibited by the terms of the COM, but that, more significantly, Plaintiffs have not tied any of the reproduced background information to Triple Net's expression of the opinions on which they rely to assert their claim of primary liability. The uncontested evidence is that Triple Net varied its statement of assumptions and probability projections of lease renewals from those that TLG expressed in the COM. Moreover, the PPM expressly advises any potential purchaser that statements in the PPM must be assumed to have been based solely on Triple Net's own due diligence. (*See* PPM 39.)

211. Under the facts of this case, the Court concludes that the uncontested evidence demonstrates that the North Carolina Plaintiffs have failed to offer proof that either Highwoods or TLG provided material aid with the requisite actual knowledge required under the Securities Act. Accordingly, the Court determines that Highwoods' Motion for Summary Judgment is GRANTED, TLG's Motion for Summary Judgment is GRANTED, Plaintiffs' Motion for Partial Summary Judgment Against Highwoods & TLG is DENIED, and any claim of secondary liability against Highwoods and TLG should be DISMISSED WITH PREJUDICE.

## H. Plaintiffs' Remaining Claims Against the Grubb & Ellis Defendants

212. While the various motions have concentrated most heavily on whether Plaintiffs' claims based on the Securities Act survive summary judgment, Plaintiffs have presented other claims on which the Grubb & Ellis Defendants now request summary judgment, including claims of breach of contract, negligence, negligent misrepresentation, breach of fiduciary duty, constructive fraud, unfair and deceptive trade practices, and punitive damages. The Court separately analyzes each of these claims below.

### (1) Breach of contract

213. Plaintiffs allege that the Grubb & Ellis Defendants materially breached the Purchase Agreement and Escrow Instructions ("Purchase Agreement") with Plaintiffs, "and/or caused Defendant NNN Office to materially breach" the agreement, when NNN Office "represented that it was the record owner" of the Durham Property, having "recently acquired the property," and that it would deed the Property from itself to each TIC, when NNN Office never in fact acquired title to the Durham Property. (Am. Compl. ¶ 210; Pls.' Mem. Opp'n to Grubb & Ellis Defs.' Mot. Summ. J. 19.) Plaintiffs allege that the Grubb & Ellis Defendants "committed other breaches in structuring the transaction," but they do not identify those breaches. (Am. Compl. ¶ 210(e).)

214. The elements of a claim for breach of contract include (1) the existence of a valid contract and (2) breach of the terms of that contract. *Bob Timberlake Collection, Inc. v. Edwards*, 176 N.C. App. 33, 43, 626 S.E.2d 315, 323 (2006).

215.    The "as is" provision in the Purchase Agreement states that "BUYER ACKNOWLEDGES THAT SELLER ONLY RECENTLY ACQUIRED THE PROPERTY AND HAS LIMITED KNOWLEDGE REGARDING THE CONDITION OF THE PROPERTY." (Purchase Agreement § 7.2.) The Purchase Agreement did not contain a covenant of seisin or any other representation that NNN Office held title to the Durham Property. The Court agrees with the Grubb & Ellis Defendants that the fact that Highwoods deeded the Durham Property directly to Plaintiffs and the deed was not first given to NNN Office does not support a breach-of-contract claim. Accordingly, summary judgment is GRANTED in favor of the Grubb & Ellis Defendants on this claim.

### (2) Negligence and negligent misrepresentation

216.    Plaintiffs allege that the Grubb & Ellis Defendants owed Plaintiffs a duty to conduct a proper and thorough due-diligence investigation and breached their duty of care when they made representations regarding Duke's lease-renewal probabilities without first determining or disclosing that Duke had issued an RFP. (Am. Compl. ¶¶ 215–16.) The Grubb & Ellis Defendants move to dismiss this claim on the grounds that there is no common-law duty of due diligence distinct from the obligations imposed by the Securities Act. (Grubb & Ellis Defs.' Mot. Summ. J. 4.)

217.    The Court agrees that Plaintiffs may recover, if at all, based on their claims under a securities act, and that they are not entitled to proceed separately on a theory of negligence grounded on Triple Net's failure to complete adequate due

diligence. Thus, summary judgment is GRANTED in favor of the Grubb & Ellis Defendants on Plaintiffs' claims of negligence and negligent misrepresentation.

### (3) Breach of fiduciary duty and constructive fraud

218. A claim for breach of fiduciary duty cannot exist in the absence of a fiduciary relationship between the parties. *Dalton*, 353 N.C. at 651, 548 S.E.2d at 707. A fiduciary relationship has been broadly defined by the North Carolina Supreme Court as a relationship in which "there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence." *Id.* (quoting *Abbitt v. Gregory*, 201 N.C. 577, 598, 160 S.E. 896, 906 (1931)). The definition requires a showing of "confidence reposed on one side, and resulting domination and influence on the other." *Id.* at 651, 548 S.E.2d at 708 (emphasis omitted) (quoting *Abbitt*, 201 N.C. at 598, 160 S.E. at 906).

219. As for NNN Capital's liability, the Court finds no case law to support the theory that managing broker–dealers owe fiduciary duties to investors. Indeed, the North Carolina Supreme Court has declined to find a fiduciary relationship in arm's-length borrower–lender transactions. *See Dallaire v. Bank of Am., N.A.*, 367 N.C. 363, 368, 760 S.E.2d 263, 266–67 (2014); *see also Berthel Fisher & Co. Fin. Servs., Inc. v. Larmon*, 695 F.3d 749, 753 (8th Cir. 2012) (holding that individual investors are not the customers of managing broker–dealers); *Fekety v. Gruntal & Co.*, 595 N.Y.S.2d 190, 190–91 (App. Div. 1993) ("[A] broker does not, in the ordinary course of business, owe a fiduciary duty to a purchaser of securities."). While a

fiduciary relationship may, in appropriate circumstances, arise as a matter of fact, *see CommScope Credit Union v. Butler & Burke, LLP*, ___ N.C. ___, 790 S.E.2d 657, 660 (2016), here, the Court finds no evidence that NNN Capital owed fiduciary duties to Plaintiffs.

220.     As for Triple Net's liability, Plaintiffs' only contention is that Triple Net "was a member and/or officer of each Plaintiff LLC at least as of March 12, 2007." (Pls.' Mem. Opp'n to Grubb & Ellis Defs.' Mot. Summ. J. 21.)  Plaintiffs cite no case law or record evidence to explain how this fact supports their claim for breach of fiduciary duty.  As the Grubb & Ellis Defendants point out, the addendum to the PPM makes clear that neither NNN Office, Triple Net, Triple Net Realty, "nor the other [TICs] will have a fiduciary duty to the [TICs], as would be applicable to an investment in a corporation, limited liability company or partnership."  (Grubb & Ellis Defs.' Summ. J. Ex. 21, at 13.)  Further, the LLC Agreement provides that Triple Net was a vice president with limited responsibilities that extended only to executing certain closing costs and loan documents for the TICs.  (*See, e.g.*, LLC Agreement §§ 3.1.5, 3.2, .3.)  This limited role does not give rise to fiduciary obligations.

221.     In the absence of a fiduciary duty, Plaintiffs' claim of constructive fraud also fails. *See Barger v. McCoy Hillard & Parks*, 346 N.C. 650, 666, 488 S.E.2d 215, 224 (1997) (holding that the plaintiffs' constructive-fraud claim failed because there was no "relationship of trust and confidence").  Accordingly, summary judgment is GRANTED in favor of the Grubb & Ellis Defendants on Plaintiffs' breach-of-fiduciary-duty and constructive-fraud claims.

### (4) Section 75-1.1

222.     Plaintiffs plead in the alternative that if the Court holds that the Securities Act does not apply because the TIC interests are not securities, it should find that the Grubb & Ellis Defendants committed unfair and deceptive trade practices in violation of N.C. Gen. Stat. § 75-1.1 (2015).  The Court concludes that Plaintiffs' investment is beyond the scope of chapter 75.  *See Skinner v. E.F. Hutton & Co.*, 314 N.C. 267, 275, 333 S.E.2d 236, 241 (1985) ("[S]ecurities transactions are beyond the scope of [section] 75-1.1."); *Oberlin Capital, L.P. v. Slavin*, 147 N.C. App. 52, 62, 554 S.E.2d 840, 848 (2001) (holding that loan agreements and other capital-raising devices are not "in or affecting commerce" for purposes of chapter 75); *Latigo Invs. II, LLC v. Waddell & Reed Fin., Inc.*, No. 06 CVS 18666, 2007 NCBC LEXIS 17, at *49 (N.C. Super. Ct. June 8, 2007) (Diaz, J.) (holding that chapter 75 did not apply where "the undisputed purpose of the transaction [at issue] . . . was to raise capital").  Accordingly, summary judgment is GRANTED in favor of the Grubb & Ellis Defendants on Plaintiffs' section 75-1.1 claim.

### (5) Civil conspiracy

223.     North Carolina does not recognize an independent cause of action for civil conspiracy.  *See Shope v. Boyer*, 268 N.C. 401, 404–05, 150 S.E.2d 771, 773–74 (1966).  Plaintiffs cannot properly "use the same alleged acts to form both the basis of a claim for conspiracy to commit certain torts *and* the basis of claims for those torts." *Jones v. City of Greensboro*, 51 N.C. App. 571, 584, 277 S.E.2d 562, 571 (1981), *overruled on other grounds by Fowler v. Valencourt*, 334 N.C. 345, 435 S.E.2d 530

(1993).  The Court concludes that Plaintiffs' stand-alone claim for civil conspiracy to violate the Securities Act should be DISMISSED.

### (6) Punitive damages

224.    Plaintiffs claim that the Grubb & Ellis Defendants are liable for punitive damages because their "tortious conduct . . . involved fraud and willful or wanton conduct."  (Am. Compl. ¶ 271.)

225.    Section 78A-56(j) of the Securities Act allows for the recovery of punitive damages if the proof requirements of chapter 1D are met, meaning that Plaintiffs must prove by clear and convincing evidence that the facts leading to liability were accompanied by an aggravating factor.  *See* N.C. Gen. Stat. §§ 1D-15(a), (b) (2015).

226.    As an initial matter, because the Securities Act claims brought by the Out-of-State Plaintiffs have been dismissed, the Court likewise dismisses the punitive-damages claim brought by the Out-of-State Plaintiffs, because the claim is premised on an alleged violation of the Securities Act.  With some doubt that the evidence will ultimately demonstrate the existence of an aggravating factor under section 1D-15(a), the Court defers to the time of trial the determination whether the North Carolina Plaintiffs may proceed with their claim of punitive damages based on an alleged violation of the Securities Act.

### I.  Plaintiffs' 54(b) Motion Is Denied as Moot.

227.    Plaintiffs ask the Court to modify the 2013 Order with respect to their punitive-damages claims against Highwoods and TLG.  *See Highwoods*, 2013 NCBC

LEXIS 11, at *66. Having dismissed all claims against Highwoods and TLG, the Court DENIES Plaintiffs' 54(b) Motion as moot.

## VI.  CONCLUSION

228.     For the reasons stated in this Order & Opinion, the Court holds and orders as follows:

A. <u>The Highwoods Lawsuit</u>

1.     Highwoods' Motion for Partial Summary Judgment on the issue whether Plaintiffs' TIC interests constitute "securities" under the Securities Act is DENIED, and summary judgment is GRANTED in favor of Plaintiffs on this issue.

2.     Highwoods' 12(c) Motion is GRANTED.

3.     TLG's 12(c) Motion is GRANTED.

4.     Highwoods' Motion for Summary Judgment is GRANTED, and claims against Highwoods are DISMISSED WITH PREJUDICE.

5.     TLG's Motion for Summary Judgment is GRANTED, and claims against TLG are DISMISSED WITH PREJUDICE.

6.     Plaintiffs' Motion for Partial Summary Judgment Against Highwoods & TLG on the issue of liability under the Securities Act is DENIED.

7.     Plaintiffs' 54(b) Motion is DENIED AS MOOT.

8.     These rulings resolve all claims against all parties in the Highwoods Lawsuit and therefore constitute a final judgment.

## B. The Grubb & Ellis Lawsuit

1. Plaintiffs' Motion for Partial Summary Judgment Against the Grubb & Ellis Defendants on claims brought under the Securities Act is DENIED.

2. The Grubb & Ellis Defendants' Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART as follows:

   a) On the issue whether Plaintiffs released all claims against the Grubb & Ellis Defendants, the Grubb & Ellis Defendants' request for summary judgment is DENIED, and summary judgment is GRANTED for Plaintiffs.

   b) Summary judgment is GRANTED in favor of Grubb & Ellis Co., and all claims against Grubb & Ellis Co. are DISMISSED WITH PREJUDICE.

   c) Summary judgment is GRANTED in favor of NNN Realty Advisors, and all claims against NNN Realty Advisors are DISMISSED WITH PREJUDICE.

   d) The Grubb & Ellis Defendants' request for summary judgment on the North Carolina Plaintiffs' claim of primary liability under the Securities Act is DENIED.

   e) Summary judgment is GRANTED in favor of the Grubb & Ellis Defendants on Plaintiffs' claims of breach of contract, breach of fiduciary duty, constructive fraud, negligence, negligent misrepresentation, civil conspiracy, and unfair and deceptive

trade practices under N.C. Gen. Stat. § 75-1.1, and those claims are DISMISSED WITH PREJUDICE.

f) Claims against the Grubb & Ellis Defendants based on the Securities Act are DISMISSED WITH PREJUDICE as to the fifty-five Out-of-State Plaintiffs. The only remaining claims under the Securities Act are the claims brought by the North Carolina Plaintiffs: NNN Durham Office Portfolio 13, LLC; Fannie B. Blackwelder; NNN Durham Office Portfolio 32, LLC; Kenneth Deno McLamb; NNN Durham Office Portfolio 33, LLC; and Cynthia McLamb.

g) Summary judgment is GRANTED for the Grubb & Ellis Defendants on Plaintiffs' claim for punitive damages under chapter 1D, and that claim is DISMISSED WITH PREJUDICE. Any claim for punitive damages under the Securities Act pursuant to N.C. Gen. Stat. § 78A-56(j) is preserved as to the North Carolina Plaintiffs, whose claim of primary liability under the Securities Act survives summary judgment.

3. The Court finds and concludes, pursuant to Rule 54(b), that final judgment shall be entered as to all claims dismissed by this Order & Opinion in the Grubb & Ellis Lawsuit, because there is no just reason for delay. To the contrary, all parties in the Grubb & Ellis Lawsuit may be prejudiced by a failure to enter final judgment as to the dismissed

claims, because the issues involving the North Carolina Plaintiffs' surviving claims overlap with, and are inextricably interrelated to, claims dismissed by this Order & Opinion. Further, there are controlling issues of law common to the Highwoods Lawsuit, in which a final judgment is being entered, and the Grubb & Ellis Lawsuit.

SO ORDERED, this the 29th day of December, 2016.

/s/ James L. Gale
James L. Gale
Chief Business Court Judge